Jake CORMAN, in his official capacity as Senator from the 34th Senatorial District of Pennsylvania and Chair of the Senate Committee on Appropriations; and Robert M. McCord, in his official capacity as Treasurer of the Commonwealth of Pennsylvania, Plaintiffs

v.

The NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant.

Commonwealth Court of Pennsylvania.

Argued June 19, 2013.

Decided Sept. 4, 2013.

Christopher B. Craig, Chief Counsel, Harrisburg, for Plaintiff Robert M. McCord.

Matthew H. Haverstick, Philadelphia, for Plaintiff Jake Corman.

Everette C. Johnson, Jr., Washington, DC, for Defendants.

BEFORE: PELLEGRINI, President Judge, McGINLEY, Judge, LEADBETTER, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, McCULLOUGH, Judge, and COVEY, Judge.

OPINION BY Judge COVEY.

Defendant, the National Collegiate Athletic Association (NCAA) preliminarily objects to the Second Amended Complaint filed by Plaintiffs, Senator Jake Corman (Senator Corman) and Treasurer Robert McCord (Treasurer McCord) (collectively, Plaintiffs), in this Court's original jurisdiction seeking injunctive and declaratory relief against the NCAA. Senator Corman represents the 34th Senatorial District of Pennsylvania in the General Assembly, and is Chair of the Senate Appropriations Committee. Plaintiffs' Second Amended Complaint at ¶ 2. Treasurer McCord is Treasurer of the Commonwealth, a constitutionally-established elected office. Plaintiffs' Second Amended Complaint at ¶ 3. The NCAA is an unincorporated association headquartered in Indianapolis, Indiana, which has members throughout the United States (U.S.) and the Commonwealth. Plaintiffs' Second Amended Complaint at ¶ 5.

Pennsylvania State University (PSU) is a "state-related institution"[1] originally established as a "land grant" university under the federal Morrill Act of 1862[2] for purposes of teaching agriculture and mechanical arts. The General Assembly accepted the land grant pursuant to the act entitled "An Act Donating Lands to the Several States and Territories which may Provide Colleges for the Benefit of Agriculture and the Mechanic Arts" (1863 Act).[3]

On July 2, 2012, the Governor of Pennsylvania signed into law the act entitled "An Act to Accept Public Lands, by the United States, to the Several States, for the Endowment of Agricultural Colleges" (Act 10A) as a supplement to the 1863 Act.[4] Pursuant to Act 10A, the Pennsylvania General Assembly appropriated $214,110,000.00 to PSU for general financial support for the fiscal year July 1, 2012 through June 30, 2013. Plaintiffs' Second Amended Complaint at ¶ 44. Section 5 of Act 10A grants the General Assembly the right to "full, complete and accurate information as may be required" concerning PSU and its agents' expenditures. Plaintiffs' Second Amended Complaint, Ex. E at 3.

On July 12, 2012, Louis J. Freeh issued a report (Freeh Report) finding that PSU's former President, various staff members of PSU's athletic department and other senior PSU officials deliberately ignored multiple credible child sexual abuse allegations beginning in the 1990s against former PSU assistant football coach Gerald A. Sandusky. Plaintiffs' Sec-

---

1. "Although an instrumentality of the Commonwealth, a state-related institution, as opposed to a state university within the State System of Higher Education, is only partially controlled by government representatives." *Bagwell v. Pennsylvania Dep't of Educ.*, 76 A.3d 81, 2013 WL 3778927 (Pa.Cmwlth. 2013).

2. 7 U.S.C. §§ 301–309.

3. Act of April 1, 1863, P.L. 213, 24 P.S. §§ 2571–2584.

4. Act of July 2, 2012, Supplement to Act of April 1, 1863, P.L. 213. The purpose of Act 10A is to make appropriations in order to implement the 1863 Act; to provide for a method of accounting for the funds appropriated; and to make an appropriation from a restricted account within the Agricultural College Land Scrip Fund. Plaintiffs' Second Amended Complaint, Ex. E at 1.

ond Amended Complaint at ¶¶ 6–9. On July 23, 2012, under threat of being excluded from participation in NCAA programs, PSU executed a Binding Consent Decree Imposed by the National Collegiate Athletic Association and Accepted by the Pennsylvania State University (Consent Decree) with the NCAA that required PSU, *inter alia,* to pay a $60 million fine in $12 million minimum annual installments beginning in 2012 over five years "into an endowment for programs preventing child sexual abuse and/or assisting the victims of child sexual abuse." Plaintiffs' Second Amended Complaint at ¶ 14 (quoting Ex. A at 5).

The NCAA established its Child Sexual Abuse Endowment Task Force (Task Force) for the purpose of developing standards for the expenditure of the fine. Plaintiffs' Second Amended Complaint at ¶ 18. At the end of 2012, the Task Force had not yet established its endowment, thus, the NCAA requested PSU to set aside the initial $12 million fine due in 2012. March 1, 2013 Declaration of Kathleen T. McNeely in Support of the Defendants' Application for Relief (McNeely Declaration),[5] Plaintiffs' Br., Ex. C at ¶ 5. PSU placed the $12 million into a money market account on December 20, 2012. *Id.*

On January 4, 2013, Senator Corman filed a complaint with this Court against the NCAA and Timothy P. White (White), in his official capacity as the Task Force Chair. Senator Corman also filed an application for preliminary injunction requesting that the NCAA and White be enjoined from disbursing any of PSU's initial $12 million payment. Based upon a Joint Stipulation wherein the NCAA stated that it did not immediately intend to disburse the fine, and agreed not to do so without 60 days' prior notice, this Court on January 16, 2013, ordered the preliminary injunction application stayed. The NCAA and White filed preliminary objections to Senator Corman's complaint.

On February 20, 2013, the Institution of Higher Education Monetary Penalty Endowment Act (Endowment Act)[6] was signed into law and became effective immediately. Section 3 of the Endowment Act requires that "[i]f an institution of higher education pays a monetary penalty [of $10 million or more] pursuant to an agreement entered into with a governing body,"[7] said penalty shall be paid into the Institution of Higher Education Monetary Endowment Trust Fund (Fund) maintained as a separate trust fund in the State Treasury. 24 P.S. § 7503(a), (b)(1). The Commonwealth's Treasurer is the sole custodian of all monies deposited into the Fund. 24 P.S. § 7503(b)(1). The Endowment Act further mandates that unless otherwise stated in the agreement, the Fund may only be used within the Commonwealth to benefit Commonwealth residents. 24 P.S. § 7503(b)(4).

Also on February 20, 2013, Senator Corman filed an amended complaint against the NCAA and White, wherein he renewed his application for preliminary injunctive relief to compel the NCAA to pay the first installment of the $60 million fine into the Fund. In response, the NCAA moved that this Court hold the preliminary injunction

---

5. Kathleen T. McNeely is "the Vice President of Administration and Chief Financial Officer for the [NCAA]." McNeely Declaration, Plaintiffs' Br., Ex. C at ¶ 2.

6. Act of February 20, 2013, P.L. 1, 24 P.S. §§ 7501–7505.

7. The Endowment Act defines "governing body" as "[a]n organization or legal entity with which an institution of higher education is associated and which body may impose a monetary penalty against the institution of higher education." 24 P.S. § 7502.

application in abeyance or enter a scheduling order that would permit the NCAA to file preliminary objections to the amended complaint because the NCAA did not yet have physical possession of the fine money. Senator Corman opposed the NCAA's motion. By March 13, 2013 order, this Court stayed the renewed application for a preliminary injunction and scheduled a status conference. The NCAA filed preliminary objections to the amended complaint.

On March 27, 2013, Senator Corman, joined by Treasurer McCord, filed a Second Amended Complaint against the NCAA seeking declaratory and injunctive relief on the basis that the PSU fine is subject to the Endowment Act and the NCAA must deposit it into the Fund. In Count I of the Second Amended Complaint, Plaintiffs aver that the NCAA violated the Endowment Act.[8]

The NCAA filed preliminary objections to the Second Amended Complaint. On June 19, 2013, the parties presented argument on the preliminary objections to this Court en banc. On June 20, 2013, Attorney General Kathleen G. Kane sent correspondence to Commonwealth Court President Judge Dan Pellegrini, stating in relevant part:

As you are likely aware, [the Office of Attorney General ("OAG")] is currently handling certain criminal prosecutions arising out of the Jerry Sandusky child sexual abuse scandal. To avoid any potential conflicts, immediately prior to my taking office, the OAG and the Governor's Office of General Counsel ("OGC") agreed—pursuant to the Commonwealth Attorneys Act [9]—that the OAG would continue to handle criminal matters relating to the Sandusky scandal and that the OGC would handle any civil matters relating to the Sandusky scandal. Accordingly, the OAG did not participate in Governor Corbett's antitrust action against the NCAA in federal court. For the same reason, the OAG declined to participate in the action brought by Senator Corman and Treasurer McCord against the NCAA in Commonwealth Court. The Treasurer, using his independent authority, has historically represented his office in matters which are the subject of litigation; the Treasurer is not obligated to request the representation of the OAG, nor is the OAG required, pursuant to the Commonwealth Attorney's [sic] Act, to provide representation on behalf of the Treasurer.

June 20, 2013 Attorney General letter (AG Letter). On June 21, 2013, this Court ordered the parties to address the standing of Treasurer McCord in light of the AG's Letter, to which they responded.[10]

The issues currently before this Court are: (1) whether Plaintiffs have standing to bring the instant action; (2) whether PSU is an indispensable party whose absence from this litigation deprives the Court of subject matter jurisdiction; (3) whether Count I of Plaintiffs' Second Amended Complaint states a claim upon which relief may be granted; and, (4)

8. While the Second Amended Complaint seeks relief under two counts, Plaintiffs withdrew Count II.

9. Act of October 15, 1980, P.L. 950, *as amended*, 71 P.S. §§ 732–101–732–506.

10. In addition to the briefs submitted by the parties in response to this Court's June 21, 2013 order, an amicus brief was filed on June 26, 2013 by the Department of Auditor General and the Public Utility Commission in support of Plaintiffs' position. Further, the Pennsylvania District Attorneys Association (PDAA) filed an Application for Leave to File Amicus Brief Nunc Pro Tunc and attached its brief thereto. The NCAA advised this Court that it did not object to the PDAA's submission, and the requested leave was granted.

whether the Endowment Act and the proffered construction of Act 10A violate the U.S. and Pennsylvania Constitutions.

 This Court's review of preliminary objections is limited to the pleadings. *Pennsylvania State Lodge, Fraternal Order of Police v. Dep't of Conservation & Natural Res.*, 909 A.2d 413 (Pa.Cmwlth. 2006), *aff'd*, 592 Pa. 304, 924 A.2d 1203 (2007).

> [This Court is] required to accept as true the well-pled averments set forth in the ... complaint, and all inferences reasonably deducible therefrom. Moreover, the [C]ourt need not accept as true conclusions of law, unwarranted inferences from facts, argumentative allegations, or expressions of opinion. In order to sustain preliminary objections, it must appear with certainty that the law will not permit recovery, and, where any doubt exists as to whether the preliminary objections should be sustained, the doubt must be resolved in favor of overruling the preliminary objections.

*Id.* at 415–16 (citations omitted).

## I. Standing

 The NCAA first contends that Plaintiffs are prohibited from pursuing this action. Specifically, the NCAA argues that under Section 204(c) of the Commonwealth Attorneys Act, 71 P.S. § 732–204(c), statutory authority to sue to collect debts and accounts owed to the Commonwealth is vested solely in the Pennsylvania Attorney General. Further, Treasurer McCord's official responsibilities as "custodian" under the Endowment Act begin when money is deposited into the Fund, and since no monies have been paid into the Fund, Treasurer McCord has no standing. Finally, the NCAA asserts that Senator Corman does not have standing because he claims standing as a legislator, but alleges no genuine impairment of his legislative powers.

Section 204(c) of the Commonwealth Attorneys Act states:

> The Attorney General shall represent the Commonwealth and all Commonwealth agencies **and upon request,** the Departments of Auditor General and **State Treasury** and the Public Utility Commission in any action brought by or against the Commonwealth or its agencies, and may intervene in any other action, including those involving charitable bequests and trusts or the constitutionality of any statute.... **The Attorney General shall collect, by suit or otherwise, all debts, taxes and accounts due the Commonwealth which shall be referred to and placed with the Attorney General for collection by any Commonwealth agency....** The Attorney General may, upon determining that it is more efficient or otherwise is in the best interest of the Commonwealth, authorize the General Counsel or the counsel for an independent agency to initiate, conduct or defend any particular litigation or category of litigation in his stead....

71 P.S. § 732–204(c) (emphasis added).

The language of Section 204(c) of the Commonwealth Attorneys Act clearly states that the Attorney General is to represent the **Commonwealth** and **Commonwealth agencies** in actions "brought by or against the Commonwealth," and specifically excludes from that directive, *inter alia,* the State Treasury. That section further mandates that "Commonwealth agencies" refer "debts ... due the Commonwealth" to the Attorney General for the Attorney General to collect. 71 P.S. § 732–204(c).

Section 102 of the Commonwealth Attorneys Act defines a Commonwealth agency as "[a]ny executive agency or independent

agency." 71 P.S. § 732–102. "Executive agency" and "independent agency" are defined as follows:

> **"Executive Agency."** The Governor and the departments, boards, commissions, authorities and other officers and agencies of the Commonwealth government, but the term does not include any court or other officer or agency of the unified judicial system, the General Assembly and its officers and agencies, or any independent agency.
>
> **"Independent Agency."** The Department of the Attorney General, the Pennsylvania Fish Commission, the Pennsylvania Game Commission, the Historical and Museum Commission, the State Civil Service Commission, the Pennsylvania Turnpike Commission, the Milk Marketing Board, the Pennsylvania Liquor Control Board, the Pennsylvania Human Relations Commission, the Pennsylvania Labor Relations Board, the State Tax Equalization Board, Pennsylvania Higher Education Assistance Agency, the Pennsylvania Crime Commission, and the State Ethics Commission. Except for the provisions of section 204(b) and (f), and for actions pursuant to 42 Pa. C.S. § 5110 (relating to limited waiver of sovereign immunity), **for the purposes of this act** the department of the Auditor General, including the Board of Claims, **State Treasury** and the Public Utility Commission **shall not be considered either executive agencies or independent agencies.**

71 P.S. § 732–102 (emphasis added). Given that Section 102 of the Commonwealth Attorneys Act explicitly excludes the State Treasury from the definitions of executive agency and independent agency, it is not a Commonwealth agency subject to the man-

dates of Section 204(c) of the Commonwealth Attorneys Act pertaining to Commonwealth agencies. Thus, Section 204(c) of the Commonwealth Attorneys Act does not prohibit Treasurer McCord from pursuing the instant action.

Moreover, the NCAA characterizes the $60 million fine as a "debt" to be collected by and due to the Commonwealth, however, Plaintiffs make no such assertion regarding the same.[11] Looking only to the pleadings before us and all reasonable inferences therefrom as we must, Plaintiffs do not allege that PSU or the NCAA owe the Commonwealth a "debt." Rather, the nature of Plaintiffs' action is that the first installment of the $60 million fine has been allocated and is payable but such payment over which the NCAA alleges authority to direct has not been made in accordance with the Endowment Act. In fact, the NCAA's pleadings and other documents submitted to this Court maintain that **the NCAA** is entitled to receive and control the $60 million fine. For example, the NCAA's Application for Relief in the Nature of a Request for Scheduling Order refers to the "constitutionality of a law that seizes money **the NCAA will lawfully acquire** through a private contract." NCAA App. for Relief at 4 (emphasis added). In addition, the NCAA asserts that it has a "contractual right to direct how those funds are spent." NCAA Mem. in Support of Preliminary Objections (NCAA Memo) at 39. Further, the Joint Stipulation to Stay Application for Preliminary Injunction states: "the [NCAA] has informed Plaintiff that for multiple reasons it has no intention to disburse or otherwise dissipate said funds in the immediate future; [a]nd ... the [NCAA] has promised to notify Plaintiff 60 days prior to any

---

**11.** "This [C]ourt has held that a demurrer cannot aver the existence of facts not apparent from the face of the challenged pleading."

*Martin v. Dep't of Transp.,* 124 Pa.Cmwlth. 625, 556 A.2d 969, 971 (1989).

intended disbursements of said funds[.]" Joint Stip. at 1. Finally, in the NCAA's June 14, 2013 letter to this Court's Chief Clerk, it refers to "legislation ... requiring 100% of the fine that Penn State **must pay to the NCAA** under the Consent Decree to be paid instead to the Commonwealth." NCAA June 14, 2013 letter at 1 (emphasis added). Given that the Second Amended Complaint does not demonstrate on its face that the $60 million fine is a "debt" owed to the Commonwealth, and the various NCAA documents which reflect that the NCAA considers the fine a "debt" owed to itself, and not the Commonwealth, we conclude that Section 204(c) of the Commonwealth Attorneys Act is inapplicable to the instant matter.

The NCAA further argues that the Pennsylvania Supreme Court's decision in *Casey v. Pennsylvania State University*, 463 Pa. 606, 345 A.2d 695 (1975), controls the standing issue here. Specifically, the NCAA contends that the *Casey* Court held "the Attorney General and the Department of Justice **alone** are empowered to collect debts due the Commonwealth." *Id.* at 618, 345 A.2d at 701 (emphasis added). The issue in *Casey*, as expressed by the Supreme Court, was "whether the Auditor General has the legal authority to bring suit to collect monies allegedly owed to the Commonwealth." *Id.* at 609, 345 A.2d at 697. In *Casey*, the Commonwealth appropriated monies to PSU for continuing education programs. The monies appropriated were only to fund the necessary costs of the programs. The Auditor General alleged that PSU received money in excess of the programs' costs and was seeking repayment from PSU for monies allegedly due the Commonwealth. Resolution of the issue required an interpretation

of the then recently-amended Administrative Code,[12] where the authority to sue and collect indebtedness owed to the Commonwealth was placed exclusively with the Attorney General and the Department of Justice. In addressing the issue, the Pennsylvania Supreme Court expressed that "[a]lthough, resolution of these ambiguities is not as clear to us as the Commonwealth Court, nonetheless we agree with the conclusion reached by that court...." *Id.* at 614–15, 345 A.2d at 700. The Supreme Court stated:

> The Commonwealth Court reasoned that the legislature's **failure to amend [Section] 903(a) by making an express exception for the Auditor General,** in the same manner that it repeatedly used to exclude the Auditor General from the provisions of the Administrative Code, set forth before, indicated a continuing legislative intent that all debts owed the Commonwealth be mandatorily referred to the Attorney General for collection.

*Id.* at 614, 345 A.2d at 699 (emphasis added). However, five years after the *Casey* decision, the General Assembly enacted the Commonwealth Attorneys Act, which requires no speculation about the legislative intent of the Administrative Code, and makes the *Casey* decision inapposite to the case herein. Moreover, as discussed above, the Commonwealth Attorneys Act specifically excludes the Auditor General, the **State Treasury** and the Public Utility Commission from its definition of executive agencies or independent agencies. 71 P.S. § 732–101.

The NCAA also relies on this Court's decision in *Knoll v. Butler*, 675 A.2d 1308 (Pa.Cmwlth.1996), *aff'd*, 548 Pa. 18, 693 A.2d 198 (1997), to support its position that the Treasurer lacks standing. The NCAA

---

**12.** Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. §§ 51– 732.

asserts that the *Knoll* Court sustained preliminary objections in the form of a demurrer on the basis that the Treasurer could not maintain her role as custodian of certain funds because the Treasurer was not yet in possession of the funds. The *Knoll* decision, although written after the Commonwealth Attorneys Act was enacted, did not involve that statute. Rather, the issue in that case was whether the Treasurer was entitled to possession of an escrow account where the conditions of the escrow had not yet been met. Specifically, as expressed by this Court, the issue was "whether the escrowed monies are funds in the possession of [the State Workers' Insurance Board] SWIB, and/or whether SWIB has legal title over them for purposes of Section 301 of [The Fiscal] Code [13] and Section 4 of the [Worker's Compensation] Act." [14] *Id.* at 1311. The *Knoll* Court held that until certain escrow conditions were satisfied, title to liquidated bank proceeds remained with the depositor, not SWIB, and thus was not subject to a custodial claim by the Treasurer. *Id.* The reasoning was the Treasurer could not become custodian of the funds until the conditions were met, and the money was released to SWIB. Here, Plaintiffs allege, and we must accept as true, that there are no conditions precedent prior to the monies being deposited into the Fund because PSU has already paid the 2012 installment.

Plaintiffs' Second Amended Complaint at ¶ 61. Accordingly, we conclude that the *Knoll* case is inapposite.

■ Next, the NCAA asserts that because no monies have been deposited into the Fund, Treasurer McCord has not been harmed. The Endowment Act applies to "all monetary penalties paid or payable under agreements between institutions of higher education and governing bodies regardless of the payment date." 24 P.S. § 7505. This Court has held:

> Something that is 'payable' has been defined as something '[c]apable of being paid; suitable to be paid; admitting or demanding payment; justly due; legally enforceable.' BLACK'S LAW DICTIONARY 1128 (6th ed. 1990). Furthermore, the definition of 'payable' goes on to indicate that 'payable' can refer to future obligations 'but, when used without qualification, [the] term normally means that the debt is payable at once....' *Id.* [15]

*Chrzan v. Workers' Comp. Appeal Bd. (Allied Corp.)*, 805 A.2d 42, 46 (Pa.Cmwlth. 2002) (emphasis and footnotes omitted).

Treasurer McCord maintains that he has standing as the statutorily-designated sole custodian of all funds deposited into the Fund created by the Endowment Act. Plaintiffs' Second Amended Complaint at ¶ 3. Section 3(b)(1) of the Endowment Act

---

**13.** Act of April 9, 1929, P.L. 343, *as amended,* 72 P.S. § 301.

**14.** Act of June 2, 1915, P.L. 762, *as amended, formerly,* 77 P.S. § 223, repealed by the Act of June 24, 1996, P.L. 350.

**15.** The Pennsylvania Supreme Court has held: The Statutory Construction Act is clear: the objective of all interpretation and construction of statutes is to ascertain and effectuate the intention of the legislature. 1 Pa.C.S.[] § 1921(a). Further, the best indication of the General Assembly's intent is the plain language of the statute. When the words of a statute are clear and unambiguous, there is no need to look beyond the plain meaning of the statute 'under the pretext of pursuing its spirit.' 1 Pa.C.S.[] § 1921(b). Consequently, only when the words of a statute are ambiguous should a court seek to ascertain the intent of the General Assembly through consideration of the various factors found in Section 1921(c) [of the Statutory Construction Act]. *Bayada Nurses, Inc. v. Dep't of Labor & Indus.*, 607 Pa. 527, 552, 8 A.3d 866, 880–81 (2010) (citations omitted).

states: "The endowment shall be established as a separate trust fund in the State Treasury and the State Treasurer shall be **custodian thereof.**" 24 P.S. § 7503(b)(1) (emphasis added). The General Assembly has designated that:

> The State Treasurer may, if requested to do so, **receive and act** as custodian for any moneys or securities which may be contributed to or deposited with the Commonwealth, or any officer, department, board or commission of the Commonwealth, by the United States, *or any agency thereof, or by any other person, persons, organization or corporation, for any designated special purpose.*

Section 1 of the Act of December 27, 1933, Sp. Sess., P.L. 113, 72 P.S. § 3832 (emphasis added).

Given the State Treasurer's responsibility as custodian of the Fund, and the allegation that the money has been "paid" and is merely awaiting direction as to its proper location, and the remainder of the fine is "payable" thereby making it subject to the Treasurer's custodial claim, we hold that Treasurer McCord currently has the authority to implement his statutory obligations. *See Pennsylvania Game Comm'n v. Dep't of Envtl. Res.,* 521 Pa. 121, 555 A.2d 812 (1989). Consequently, Treasurer McCord has standing.

 The NCAA contends that Senator Corman lacks standing because:

> [T]he Second Amended Complaint does not allege any genuine interference with Senator Corman's *legislative* functions. Neither the Endowment Act or Act 10A confers upon Senator Corman any personal interest in this matter that is different from the stake that each citizen has in seeing the law observed.

NCAA Memo at 20 (quotation marks omitted). Senator Corman rejoins that under Section 4(b)(1) of the Endowment Act, the Pennsylvania Commission on Crime and Delinquency (Commission) is required to provide him as the Chair of the Senate Appropriations Committee "notice of any proposed expenditure of money from the endowment ... for review and comment." 24 P.S. § 7504(b)(1). That section further provides that "[n]o proposed expenditure of money from the endowment may occur until 30 days after the date of the notice for the proposed expenditure." *Id.* The Commission is also required to provide him "an annual report itemizing all approved expenditures of money from the endowment ... [which] include[s] the name of each organization receiving an expenditure from the endowment, the amount received by each organization and summary information aggregating expenditures by expenditure category pursuant to [S]ection 3(b)(4) [of the Endowment Act]." 24 P.S. § 7504(b)(2).

This Court has held that "once ... votes which [legislators] are entitled to make have been cast and duly counted, their interest as legislators ceases. Some other nexus must then be found...." *Wilt v. Beal,* 26 Pa.Cmwlth. 298, 363 A.2d 876, 881 (1976).

Our Pennsylvania Supreme Court recognized that:

> The concept of **'standing'** in its accurate legal sense, is concerned only with the question of *who* **is entitled to make a legal challenge** to the matter involved.... Although our law of standing is generally articulated in terms of whether a would-be litigant has a 'substantial interest' in the controverted matter, and whether he has been 'aggrieved' or 'adversely affected' by the action in question, we must remain mindful that the purpose of the 'standing' requirement is to insure that a legal challenge is by a proper party.... The terms 'substantial interest', 'aggrieved'

and 'adversely affected' are the general, usual guides in that regard, but they are not the only ones. For example, **when the legislature statutorily invests an agency with certain functions, duties and responsibilities, the agency has a legislatively conferred interest in such matters. From this it must follow that, unless the legislature has provided otherwise, such an agency has an implicit power to be a litigant in matters touching upon its concerns. In such circumstances the legislature has implicitly ordained that such an agency is a proper party litigant, *i.e.*, that it has 'standing.'**

*Pennsylvania Game Comm'n,* 521 Pa. at 127–28, 555 A.2d at 815 (emphasis added). *See also Commonwealth v. E. Brunswick Twp.,* 956 A.2d 1100 (Pa.Cmwlth.2008); *Pennsylvania Game Comm'n v. Pennsylvania Pub. Util. Comm'n,* 651 A.2d 596 (Pa.Cmwlth.1994).

We find *Pennsylvania Game Commission v. Department of Environmental Resources* controlling in the instant matter. Here, the legislature statutorily vested certain specifically-identified individuals, including Senator Corman, with the right to 30 days advance notice of proposed expenditures from the Fund in order to review and comment upon the proposed expenditures. *See* 24 P.S. § 7504(b)(1). We must interpret and construe statutes to effectuate the intent of the legislature. *See* Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a). A reasonable reading of the statute requires such advance notice to permit those specified individuals an opportunity to be heard regarding proposed expenditures. 1 Pa.C.S. § 1921(a). In essence, the legislature invested those named individuals with oversight responsibility and authority regarding the monies subject to the Endowment Act. Therefore, Senator Corman has more responsibility under the Endowment Act beyond his legislative function because he has specific statutory obligations. *See Zemprelli v. Thornburgh,* 47 Pa.Cmwlth. 43, 407 A.2d 102 (1979). Clearly, Senator Corman's statutory duties for overseeing Fund expenditures is a "matter[ ] touching upon [his] concerns." *Pennsylvania Game Comm'n,* 521 Pa. at 128, 555 A.2d at 815. As such, "the legislature has implicitly ordained that [Senator Corman, as Chair of the Senate Appropriations Committee,] is a proper party litigant, *i.e.,* that [he] has 'standing.'" *Id.* Accordingly, we conclude that Senator Corman has standing.[16] Because we hold that both Treasur-

**16.** The Dissent maintains that Senator Corman is merely

> one of the numerous members of the General Assembly listed in Section 4(b)(1) and (2) of the Endowment Act, 24 P.S. § 7504(b)(1) and (2), **that compose *a panel* that is entitled to notice** of the Pennsylvania Commission on Crime and Delinquency's proposed disbursements from the Endowment Fund and to receive the Commission's annual report of all such expenditures.... However, **the panel, of which Senator Corman is a member,** does not have the substantial, direct or immediate interest to support legislative standing with respect to the instant action involving the deposit of the penalty funds in the State Treasury under the Endowment Act because it only has

> review and comment powers of the Commission's actions under Section 4(b)(1) and (2) to propose corrective legislative action.... Even if **the panel** would have the requisite interest, **Senator Corman is merely a member of that panel and one member of the body does not have standing to enforce.**

Dissenting Op. at 1174–75 n.5 (emphasis added). Contrary to the Dissent's assertions, there is no "panel." The word "panel" does not exist in the Endowment Act and, therefore, the identified individuals are not members of a panel, nor does the Endowment Act in any manner provide that the review and comment powers are to "propose corrective legislative action." Specifically, the Endowment Act expressly names 10 General Assem-

er McCord and Senator Corman have standing, we overrule the NCAA's first preliminary objection.

## II. Indispensable Party

■ The NCAA next argues that PSU is an indispensable party. It specifically contends that PSU's performance under the Consent Decree, its relationship to the Commonwealth, the terms by which it may contract with third parties, and the conditions upon which it receives state-appropriated funds are unavoidably at issue in this action. Consequently, because PSU is not a party to this action, the NCAA maintains that this Court does not have subject matter jurisdiction.

■ It is well established that "[t]he failure to join an indispensable party to a lawsuit deprives the court of subject matter jurisdiction." *HYK Constr. Co., Inc. v. Smithfield Twp.,* 8 A.3d 1009, 1015 (Pa.

Cmwlth.2010). The Pennsylvania Supreme Court has held:

[A] party is indispensable when his or her rights are so connected with the claims of the litigants that no decree can be made without impairing those rights.[17] [T]he basic inquiry in determining whether a party is indispensable concerns whether justice can be done in the absence of him or her. In undertaking this inquiry, the nature of the claim and the relief sought must be considered. Furthermore, we note the general principle that, in an action for declaratory judgment, all persons having an interest that would be affected by the declaratory relief sought ordinarily must be made parties to the action. Indeed, Section 7540(a) of the Judicial Code, 42 Pa.C.S. § 7540(a), which is part of Pennsylvania's Declaratory Judgments Act, states that, [w]hen declaratory relief is sought, all persons shall be made parties who

---

bly leaders from different political parties and requires that the individuals holding these legislatively-identified positions be given an opportunity to review all proposed expenditures and the power to be heard concerning the same. Not every legislator possesses this right; rather, the General Assembly conferred this interest only upon the legislators holding the enumerated leadership positions. Pennsylvania courts have recognized:

Standing may be had through a variety of ways. **The legislature may grant it explicitly to an** agency or **individual by statute;** the legislature may grant it implicitly to an agency by investing it with certain functions, duties and responsibilities; or it may be permitted under common law where the status of the petitioner is that of an aggrieved party.

*In re: Hickson,* 765 A.2d 372, 376 (Pa.Super.2000) (emphasis added; quotation marks omitted). Senator Corman's interest is not as a mere panel member, because no panel exists. Instead, he has standing as a legislatively-designated **individual.**

Finally, the Dissent points to *Fumo v. City of Philadelphia,* 601 Pa. 322, 972 A.2d 487 (2009), to support its conclusion that Senator

Corman's interests are no different than those shared by all citizens, and are insufficient to confer standing. Dissenting Op. at 1174–75 n.5. In *Fumo,* the Supreme Court granted standing to state legislators to pursue a claim asserting that the legislators' authority as members of the General Assembly had been usurped. However, the Supreme Court denied those same legislators standing to bring a claim asserting "only a generalized grievance about the conduct of government that all citizens share." *Fumo,* 601 Pa. at 347, 972 A.2d at 502. As discussed above, Senator Corman's interests far exceed those of the general population because, in his role as Chair of the Appropriations Committee, he has been conferred statutorily-mandated oversight responsibilities.

17. "A corollary of this principle is that a party against whom no redress is sought need not be joined. In this connection, if the merits of a case can be determined without prejudice to the rights of an absent party, the court may proceed." *Sprague v. Casey,* 520 Pa. 38, 48–49, 550 A.2d 184, 189 (1988) (citations omitted); *see also Banfield v. Cortes,* 922 A.2d 36 (Pa.Cmwlth.2007).

have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding. While this joinder provision is mandatory, it is subject to limiting principles. For example, where the interest involved is indirect or incidental, joinder may not be required. Additionally, where a person's official designee is already a party, the participation of such designee may alone be sufficient, as the interests of the two are identical, and thus, the participation of both would result in duplicative filings.

*City of Phila. v. Commonwealth,* 575 Pa. 542, 567–68, 838 A.2d 566, 581–82 (2003) (citations, footnotes and quotation marks omitted).

The determination of an indispensable party question involves at least these considerations:

1. Do absent parties have a right or interest related to the claim?

2. If so, what is the nature of that right or interest?

3. Is that right or interest essential to the merits of the issue?

4. Can justice be afforded without violating the due process rights of absent parties?

*Mechanicsburg Area Sch. Dist. v. Kline,* 494 Pa. 476, 481, 431 A.2d 953, 956 (1981).

The instant action pertains to the disposition of monies PSU has allocated pursuant to its obligations under the Consent Decree. Plaintiffs do not seek redress from PSU, but rather, from the NCAA. Under the Consent Decree, PSU is required to pay the fine:

**into an endowment for programs preventing child sexual abuse and/or assisting the victims of child sexual abuse**.... The proceeds of this fine may not be used to fund programs at the University. No current sponsored athletic team may be reduced or eliminated in order to fund this fine.

Plaintiffs' Second Amended Complaint, Ex. A at 5 (emphasis added).

Nothing in the Consent Decree permits PSU to affect the disposition of the fine being paid into the Fund. Instead, the Consent Decree merely requires PSU to deposit the funds "into an endowment for programs preventing child sexual abuse and/or assisting the victims of child sexual abuse." Plaintiffs' Second Amended Complaint, Ex. A at 5. As reflected in the Consent Decree and as noted by Plaintiffs, "[PSU] has no role whatsoever in the disbursement, dissemination, or distribution of fine money under the Consent Decree once the funds are deposited into the endowment." Plaintiffs' Br. at 21. Thus, although PSU may have rights or an interest **related** to the claim, it does not appear that its rights and obligation to deposit monies into an endowment for the aforementioned purposes will be affected by the outcome of this litigation, and thus PSU's rights and interest are not "essential to the merits of the issue" before this Court. *Mechanicsburg Area Sch. Dist.,* 494 Pa. at 481, 431 A.2d at 956. Further, because PSU has no authority under the Consent Decree to affect the disposition of monies paid into the endowment, and its obligations under the Consent Decree will not be affected regardless of the outcome of this litigation, at this time, it appears that justice can be "afforded without violating [its] due process rights." *Id.*

The NCAA also asserts that PSU is an indispensable party because the counts in Plaintiffs' Second Amended Complaint:

fundamentally implicate [PSU's] autonomy, its relationship to the Commonwealth government, the terms by which it can transact business with third parties (including its participation in the

NCAA), the conditions upon which it receives state-appropriated funds, and its control over the expenditures of *any* of its funds.... The premise of Plaintiffs' arguments, and of the Endowment Act itself, is that if [PSU] accepts any state support it has given the General Assembly a right to control or veto *all* of [PSU's] contracts or expenditures—even those that have nothing to do with state funds.... If correct, those arguments would radically transform [PSU's] relationship with the Commonwealth.

NCAA Memo at 25–26 (citations omitted). Contrary to the NCAA's argument, the outcome of this action will not determine the ability of the General Assembly or the Chair of the Senate Appropriations Committee to control PSU's contracts and expenditures. The Endowment Act applies in limited and clearly-delineated circumstances where an institution of higher learning pays a monetary penalty pursuant to an agreement entered into with a governing body, where the penalty is at least $10 million to be paid in installments over a time period in excess of one year, and where the agreement provides that the penalty will be used for a specific purpose. 24 P.S. § 7503. In fact, Sections 3(b)(3) and 3(b)(4) of the Endowment Act specifically permit the disbursement provisions of the Endowment Act to be displaced by explicit language in such an agreement. *Id.*

Contrary to the Dissent's claim that the Endowment Act imposes upon PSU "the responsibility to deposit the money into the [F]und," the Endowment Act is silent as to who has the obligation to make such deposit. Dissenting Op. at 1173. Section 3(a) of the Endowment Act reads, in pertinent part, as follows: "If an institution of higher education pays a monetary penalty pursuant to an agreement entered into with a governing body ... then the monetary penalty shall be deposited into an endowment that complies with the provisions of subsection (b)." Where the legislature has not spoken we will not impose a duty. *See Bixler v. State Ethics Comm'n*, 847 A.2d 785 (Pa.Cmwlth.2004). To impose such a duty would also preclude the parties from freely negotiating and agreeing upon their contract terms concerning payment obligations. *See Glassmere Fuel Serv., Inc. v. Clear*, 900 A.2d 398 (Pa.Super.2006). The undisputed facts herein are that "Penn State will not be obligated to transfer the funds from its money market account into the Endowment **until directed to do so by the NCAA.**" McNeely Declaration at ¶ 7 (emphasis added).

▆▆▆▆ Moreover, the Consent Decree itself undermines the NCAA's argument that PSU is an indispensable party because PSU has waived its rights to any litigation regarding the Consent Decree. The pertinent Consent Decree language states:

> [PSU] **expressly agrees not to challenge the consent decree and waives any claim to further process,** including, without limitation, any right to a determination of violations by the NCAA Committee on Infractions, any appeal under NCAA rules, **and any judicial process related to the subject matter of this Consent Decree.**

Plaintiffs' Second Amended Complaint, Ex. A at 2 (emphasis added). The Pennsylvania Supreme Court has held:

> A consent decree is not a legal determination by the court of the matters in controversy but is merely an agreement between the parties-a contract binding the parties thereto to the terms thereof[.] As a contract, the court, in the absence of fraud, accident or mistake, had neither the power nor the authority to modify or vary the terms set forth....

*Lower Frederick Twp. v. Clemmer*, 518 Pa. 313, 328, 543 A.2d 502, 510 (1988) (citations and quotation marks omitted). "A waiver is the intentional relinquishment of a known right." *First Nat'l Bank of Milford v. Dep't of Banking*, 4 Pa.Cmwlth. 168, 286 A.2d 480, 482 (1972); *see also Linda Coal & Supply Co. v. Tasa Coal Co.*, 416 Pa. 97, 204 A.2d 451 (1964). "If there is no constitutional or statutory mandate and no public policy prohibiting, an accused may waive any privilege which he is given the right to enjoy...." *Commonwealth v. Burke*, 175 Pa.Super. 128, 103 A.2d 476, 479 (1954). A party may "voluntarily relinquish his right to be heard." *Adams v. Lawrence Twp. Bd. of Supervisors*, 153 Pa.Cmwlth. 418, 621 A.2d 1119, 1121 (1993). "Waivers which release liability for actions not accrued at the time of the release are generally only invalid if they involve future actions entirely different than ones contemplated by the parties at the time of the release." *Bowman v. Sunoco, Inc.*, —— Pa. ——, 65 A.3d 901, 909 (2013). Here, PSU clearly waived its right to participate in any judicial process contemplated to arise from the Consent Decree. Absent fraud, accident or mistake, this Court may not modify or vary the parties' express contractual language. Thus, we hold that PSU is not an indispensable party, and we overrule the NCAA's second preliminary objection.[18]

In support of its conclusion that PSU is an indispensable party, the Dissent maintains that the Declaratory Judgments Act, 42 Pa.C.S. § 7540(a), mandates that PSU be joined. The pertinent provision of the Declaratory Judgments Act states: "all persons shall be made parties **who have** or **claim any interest which would be affected by the declaration.**" (Emphasis added). As discussed above, PSU has unequivocally denied any interest in and, in fact, expressly waived "any claim to further process." Plaintiffs' Second Amended Complaint, Ex. A at 2. Nor does PSU have "any interest which would be affected by the [Plaintiffs' requested] declaration[s]." 42 Pa.C.S. § 7540(a). Specifically, Plaintiffs' Prayer for Relief in Count I reads as follows:

WHEREFORE, Plaintiffs request that this Court grant the following relief:

a. A declaration that the Endowment Act is a valid and constitutional law;

b. A declaration that the NCAA has violated the Endowment Act;

c. A declaration that the entirety of the monetary penalty in the Consent Decree be paid to the State Treasury;

d. An order compelling the NCAA to immediately pay or direct payment of the first $12 million installment to the State Treasury;

e. An injunction compelling compliance by the NCAA with the Endowment Act;

f. Attorneys' fees and costs; and

g. Such other relief as this Court deems just and proper.

Plaintiffs' Second Amended Complaint at 13–14. No requested declaration impacts

---

**18.** However, if during the pendency of this action, an issue arises establishing that PSU is an indispensable party, this Court shall order its joinder pursuant to Pennsylvania Rule of Civil Procedure (Pa.R.C.P.) No. 2232(c). Pa. R.C.P. No. 2232(c) states:

At any stage of an action, the court may order the joinder of any additional person who could have joined or who could have been joined in the action and may stay all proceedings until such person has been joined. The court in its discretion may proceed in the action although such person has not been made a party if jurisdiction over the person cannot be obtained and the person is not an indispensable party to the action.

PSU in any manner. Further, the Dissent contends that "Senator Corman's and Treasurer McCord's own prayer for relief seeks to order PSU to pay the first install-ment of the penalty funds directly to the State Treasury or to order the NCAA to deposit the first installment into the State Treasury following payment by PSU." Dis-senting Op. at 1173. However, the prayer for relief in Plaintiffs' Second Amended Complaint Count I, quoted above, does not contain such a request.

### III. State a Claim for which Relief Can be Granted

 Next, the NCAA contends that Count I of Plaintiffs' Second Amended Complaint fails to state a claim for which relief can be granted. Specifically, the NCAA declared that it "will not be in a position to demand payment from [PSU] until its Task Force has established an endowment, hired a third-party adminis-trator, and established guidelines for how the endowment's funds should be spent." NCAA Memo at 28. The NCAA avers that these steps have not yet been taken because Plaintiffs' legal maelstrom has made it impossible to proceed. The NCAA argues that until PSU actually pays the penalty to the NCAA, the NCAA has not violated the Endowment Act.

Here, the Consent Decree requires only that the fine "shall be paid . . . into an endowment for programs preventing child sexual abuse and/or assisting the victims of child sexual abuse." Plaintiffs' Second Amended Complaint, Ex. A at 5. In their Second Amended Complaint, Plaintiffs aver: "Upon information and belief, the first $12 million installment has been set aside by [PSU], but not paid to the NCAA.

But the NCAA has averred that it can direct [PSU] at any time to pay over the funds to a fund of its choosing." Plaintiffs' Second Amended Complaint at ¶ 15. Plaintiffs also state that "[PSU] has al-ready paid the first fine installment into a separate account and the NCAA has the power to command [PSU] to spend those funds as directed at any time, thus [PSU] has paid a fine under the Consent Decree," but "[s]ince the NCAA has not paid the $12 million or directed [PSU] to pay the $12 million, as the NCAA claims to have the authority to do, the NCAA stands in violation of the Endowment Act." Plain-tiffs' Second Amended Complaint at ¶¶ 61–62.

It is undisputed that PSU is an "institu-tion of higher education," the NCAA is a "governing body," and the Consent Decree constitutes an agreement between the two.[19] Section 5 of the Endowment Act states that it "shall apply to all monetary penalties **paid or payable** under agree-ments between institutions of higher edu-cation and governing bodies **regardless of payment date.**" 24 P.S. § 7505 (emphasis added). The McNeely Declaration upon which Plaintiffs rely states that " . . . the NCAA requested that [PSU] set aside the first $12 million installment of the fine. To the best of my knowledge, on Decem-ber 20, 2012, [PSU] placed $12 million into a money market account. . . . [PSU] will not be obligated to transfer the funds from its money market account into the Endow-ment until directed to do so by the NCAA. . . ." McNeely Declaration at ¶¶ 5, 7. Plaintiffs maintain that to the extent the fine was set aside, removed from PSU's budget and merely awaits the NCAA's fur-ther instruction, this installment has been

---

**19.** Section 2 of the Endowment Act defines "[i]nstitution of higher education" as "[a] postsecondary educational institution in this Commonwealth that receives an annual ap-propriation from an act of the General Assem-bly." 24 P.S. § 7502. "[G]overning body" is defined *supra* at 1154 n.7.

paid or is "payable" (i.e., immediately legally enforceable). Therefore, accepting Plaintiffs' allegations as true, it not appearing "with certainty that the law will not permit recovery," and resolving all doubt in favor of the non-moving party as we must, we hold that Count I of Plaintiffs' Second Amended Complaint states a claim for which relief can be granted, and we overrule the NCAA's third preliminary objection.

## IV. Constitutionality

 Finally, the NCAA argues that the Endowment Act and Act 10A violate the U.S. and Pennsylvania Constitutions while concurrently maintaining that "the appropriate way for the NCAA to present those constitutional issues for this Court's consideration would be as affirmative defenses in an 'Answer and New Matter,' with the opportunity for appropriate and focused briefing." NCAA Memo at 37–38. A court may entertain the merits of affirmative defenses when improperly raised in preliminary objections where "the opposing party fails to object to the procedural defect...." *Wurth v. City of Phila.,* 136 Pa.Cmwlth. 629, 584 A.2d 403, 405 (1990); *see also Farinacci v. Beaver Cnty. Indus. Dev. Auth.,* 510 Pa. 589, 511 A.2d 757 (1986). Since Plaintiffs did not object to the Court deciding this issue raised by the NCAA, and both parties have briefed the constitutional issues at length, we will address the NCAA's constitutional challenges. *See Patton v. Republic Steel Corp.,* 342 Pa.Super. 101, 492 A.2d 411 (1985).

 When considering a constitutional challenge to properly enacted legislation, we are mindful of the fact that

[o]ur law provides a strong presumption that legislative enactments, as well as the manner in which legislation is enacted, do not violate the Constitution. A

party that challenges the constitutionality of a statute bears 'a very heavy burden of persuasion' to overcome this presumption. 'Accordingly, a statute will not be declared unconstitutional unless it *clearly, palpably,* and *plainly* violates the Constitution [and a]ll doubts are to be resolved in favor of finding that the legislative enactment passes constitutional muster.'

*Ass'n of Settlement Cos. v. Dep't of Banking,* 977 A.2d 1257, 1261 (Pa.Cmwlth.2009) (citations omitted).

The NCAA specifically contends that the Endowment Act violates the Takings Clauses of the U.S. and Pennsylvania Constitutions by seeking to confiscate funds from a private entity without just compensation. The U.S. Constitution provides: "No person shall be ... deprived of ... property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. Article I, Section 1 of the Pennsylvania Constitution states: "All men ... have certain inherent and indefeasible rights, among which are those of ... acquiring, possessing and protecting property...." Pa. Const. art. I, § 1. Article I, Section 10 of the Pennsylvania Constitution declares: "[P]rivate property [shall not] be taken or applied to public use, without authority of law and without just compensation being first made or secured." Pa. Const. art. I, § 10. Federal and state constitutional Takings Clause provisions are interpreted using the same framework and standards. *See Smith v. Cortes,* 879 A.2d 382 (Pa.Cmwlth.2005), *aff'd,* 587 Pa. 506, 901 A.2d 980 (2006).

 In the context of the Takings Clauses, "a taking occurs when [an] entity clothed with the power substantially deprives an owner of the use and enjoyment of his property. A taking may also occur if a regulation enacted for a public purpose

under the government's police powers prevents the [property] owner from using his [property]." *People United to Save Homes v. Dep't of Envtl. Prot.*, 789 A.2d 319, 326 (Pa.Cmwlth.2001) (citation omitted). However, as a threshold matter, to establish that a compensable taking has occurred, the property owner must establish that a valid property right has been affected. *Id.*

As previously stated, it is well settled that a consent decree is "in essence a contract binding the parties thereto." *Commonwealth v. U.S. Steel Corp.*, 15 Pa. Cmwlth. 184, 325 A.2d 324, 328 (1974) (quoting *Commonwealth v. Rozman*, 10 Pa.Cmwlth. 133, 309 A.2d 197, 199 (1973)). It is also recognized that "[v]alid contracts are property." *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934). Analogous to a contract, a valid consent decree "requires a mutual understanding of . . . the parties." *U.S. Steel Corp.*, 325 A.2d at 328 (quoting *Rozman*, 309 A.2d at 199). The parties herein acquiesced to the Consent Decree. Notably void from the Consent Decree is any language that suggests the $60 million fine ever becomes the NCAA's property. Instead, the Consent Decree unambiguously mandates that the fine be paid "into an endowment for programs preventing child sexual abuse and/or assisting the victims of child sexual abuse." Plaintiffs' Second Amended Complaint, Ex. A at 5. The Consent Decree does not contain a scintilla of language that suggests the NCAA will have ownership of or control over the fine paid by PSU. To endorse the NCAA's argument would require this Court to speculate as to the intentions of the parties, which is not its role. "The Court's inquiry should focus on what the agreement itself expressed and not on what the parties may have silently intended." *Bean v. Dep't of State, State Bd. of Funeral Dirs.*, 855 A.2d 148, 155 (Pa.Cmwlth.2004) (quoting *Empire Sanitary Landfill, Inc. v. Riverside Sch. Dist.*, 739 A.2d 651, 654 (Pa.Cmwlth.1999)). Accordingly, the NCAA has failed to establish a cognizable property interest that is affected.

The NCAA's assertion that it has a property interest in a "contractual right to direct how th[e] funds are spent" is equally unpersuasive. NCAA Memo at 39. The Consent Decree contains no language that suggests the NCAA has such a property interest. Because the Consent Decree lacks any language evidencing that ownership of the fine transfers to the NCAA, and it is not the role of this Court to insert or alter terms of an agreement, the NCAA fails to satisfy its threshold burden of demonstrating that a valid property right has been affected and further Takings Clause analysis is unnecessary. *See, e.g., Tri-State Transfer Co. Inc. v. Dep't of Envtl. Prot. Tinicum Twp.*, 722 A.2d 1129 (Pa. Cmwlth.1999). Thus, we conclude the Endowment Act does not violate the Takings Clauses of the U.S. and Pennsylvania Constitutions.

The NCAA also argues that the Endowment Act and the proffered construction of Act 10A violate the Dormant Commerce Clause of the U.S. Constitution by regulating how out-of-state private persons can spend money they have lawfully obtained. Plaintiffs respond that the Endowment Act complies with the Commerce Clause as interpreted by the U.S. Supreme Court in *United Haulers Association, Inc. v. Oneida–Herkimer Solid Waste Management Authority*, 550 U.S. 330, 127 S.Ct. 1786, 167 L.Ed.2d 655 (2007), and the market participant doctrine, and does not discriminate against interstate commerce.

Article 1, Section 8, Clause 3 of the U.S. Constitution provides that "Congress shall have the power [t]o regulate Commerce

... among the several States...." U.S. Const. art. I, § 8, cl. 3.

> While the Commerce Clause expressly speaks only to the ability of Congress to regulate interstate commerce, it has been interpreted to contain an implied limitation on the power of the States to interfere with or impose burdens on interstate commerce. This limitation has been sometimes coined the negative or dormant Commerce Clause.... The dormant Commerce Clause prohibits economic protectionism-that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.

*Office of Disciplinary Counsel v. Marcone*, 579 Pa. 1, 20, 855 A.2d 654, 666 (2004) (citation and quotation marks omitted). This Court has pointed out:

> Supreme Court Commerce Clause precedent is abundant, but there is no bright-line test to determine whether a statute violates the Commerce Clause. Modern Commerce Clause jurisprudence, therefore, involves a case-by-case examination of whether the statute discriminates against interstate commerce. Thus, we are admonished by the Supreme Court to examine the provisions of the [Endowment] Act at issue here with both deference to Commerce Clause precedent and sensitivity to the unique factual circumstances surrounding the [Endowment] Act.

*Indianapolis Power & Light Co. v. Pennsylvania Pub. Util. Comm'n*, 711 A.2d 1071, 1075 (Pa.Cmwlth.1998) (citations and footnote omitted). The U.S. Supreme Court has held:

> To determine whether a law violates this so-called dormant aspect of the Commerce Clause, **we first ask whether it discriminates on its face against interstate commerce.** In this context, discrimination simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. Discriminatory laws motivated by simple economic protectionism are subject to a virtually *per se* rule of invalidity, which can only be overcome by a showing that the State has no other means to advance a legitimate local purpose[.]

*United Haulers Ass'n, Inc.*, 550 U.S. at 338–39, 127 S.Ct. 1786 (citations and quotation marks omitted; emphasis added).

Section 3(b)(4) of the Endowment Act expressly provides that "[u]nless **otherwise expressly stated in the agreement,** the funds may only be used within this Commonwealth for the benefit of the residents of this Commonwealth...." 24 P.S. § 7503(b)(4) (emphasis added). Thus, the Endowment Act requires that the monetary penalty be expended in the Commonwealth **only if** an agreement subject to the Endowment Act does not specify that the funds are to be spent elsewhere. Therefore, the NCAA or any other governing body subject to the Endowment Act, and a Pennsylvania institution of higher education may agree that the monetary penalty be used outside the Commonwealth. Moreover, nothing in the Endowment Act prohibits out-of-state entities from applying for and receiving monies from the Fund, as is required by any in-state entity. In addition, there are no allegations that the Fund has any impact on out-of-state economic interests, let alone burdens any out-of-state economic interest.

Act 10A designates that PSU must apply the monies appropriated to it from the General Assembly "only for such purposes as are permitted in this act...." Plaintiffs' Second Amended Complaint, Ex. E. The parties do not cite any provision in Act 10A that expressly restricts where PSU's expenditures may be made. In their Second Amended Complaint, Plaintiffs state

merely that "[n]othing in Act 10A of 2012 grants any person or organization the right to divert the funds for national causes." Plaintiffs' Second Amended Complaint at ¶ 49. However, neither Act 10A's express language nor Plaintiffs' interpretation implicate the Commerce Clause. Because neither the Endowment Act, nor Act 10A, on their face or in their practical operation discriminate against interstate commerce, they do not violate the Commerce Clause of the U.S. Constitution.

■■■ The NCAA further maintains that the Endowment Act and the proffered construction of Act 10A violate the Contracts Clauses of the U.S. and Pennsylvania Constitutions by impairing obligations under lawful contracts.

> The Contract Clause of the United States Constitution provides, in relevant part, that '[n]o state shall enter into any ... Law impairing the Obligation of Contracts.' U.S. Const. art. I, § 10. The Contract Clause of the Pennsylvania Constitution similarly provides that '[n]o ... law impairing the obligation of contracts ... shall be passed.' Pa. Const. art. I, § 17. Our Pennsylvania Supreme Court has held that the Contract Clause of the Pennsylvania Constitution is generally to be applied in the same manner as its federal counterpart.

*Workers' Comp. Judges Prof'l Ass'n v. Exec. Bd. of Commonwealth*, 39 A.3d 486, 493 (Pa.Cmwlth.2012), *aff'd*, — Pa. ——, 66 A.3d 765 (2013). The U.S. Court of Appeals for the Third Circuit has explained:

> In order to prove a violation of this constitutional provision, a plaintiff must demonstrate that a change in state law has operated as a substantial impairment of a contractual relationship. Thus, Contract Clause analysis requires three threshold inquiries: (1) whether there is a contractual relationship; (2) whether a change in a law has impaired that contractual relationship; and (3) whether the impairment is substantial. If it is determined that a substantial impairment of a contractual relationship has occurred, the court must further inquire whether the law at issue has a legitimate and important public purpose and whether the adjustment of the rights of the parties to the contractual relationship was reasonable and appropriate in light of that purpose. If the impaired contractual relationship is between private parties, the court will defer to the legislative judgment concerning the importance of the public purpose and the manner in which that purpose is being pursued.

*Transp. Workers Union of Am., Local 290 v. S.E. Pa. Transp. Auth.*, 145 F.3d 619, 621 (3d Cir.1998) (citations and quotation marks omitted).

The Consent Decree is dated July 23, 2012. The Endowment Act became effective on February 20, 2013. Although it is clear that "there is a contractual relationship" by virtue of the Consent Decree, we must consider whether the change in the law has "impaired that contractual relationship." *Transp. Workers Union of Am., Local 290*, 145 F.3d at 621.

This Court has recognized:

> Although the Contract Clause appears to proscribe any impairment, the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula. [L]iteralism in the construction of the contract clause ... would make it destructive of the public interest by depriving the State of its prerogative of self protection.

*S. Union Twp. v. Dep't of Envtl. Prot.*, 839 A.2d 1179, 1188 n. 13 (Pa.Cmwlth.2003) (citation omitted), *aff'd*, 578 Pa. 564, 854 A.2d 476 (2004). Under the Consent De-

cree's "Punitive Component", PSU is required to pay the fine:

> **into an endowment for programs preventing child sexual abuse and/or assisting the victims of child sexual abuse**.... The proceeds of this fine may not be used to fund programs at the University. No current sponsored athletic team may be reduced or eliminated in order to fund this fine.

Plaintiffs' Second Amended Complaint, Ex. A at 5 (emphasis added). The Consent Decree does not specify any particular endowment that is to receive the fine proceeds or place any geographical restriction on the use of the funds. Instead, the Consent Decree describes only the purposes for which the endowment must be used. Thus, the Consent Decree's language, as negotiated by the NCAA, merely imposes a penalty upon PSU requiring PSU to pay certain monies for programs preventing child sexual abuse and/or assisting child sexual abuse victims. Despite the NCAA's contention, there is nothing in the Consent Decree which provides for or evidences any obligation that the NCAA is to create the endowment or that the NCAA is to **collect** the fine. Rather, the Endowment Act directs that the fine be paid into an endowment to be used for the exact purposes identified in the Consent Decree. Because the Consent Decree is silent as to the establishment and control of the subject endowment, and the Endowment Act does not interfere with PSU's Consent Decree obligations, or with the use of the funds for the purposes stated

therein, we hold that the Endowment Act does not impair the contractual relationship between the NCAA and PSU and, consequently, does not violate the Contracts Clauses of the U.S. and Pennsylvania Constitutions.

Even if this Court concluded that the Endowment Act impaired the Consent Decree, that impairment is not substantial. As previously discussed, the Endowment Act impacts the contract in two ways: by requiring the endowment to be controlled by the Commonwealth, and by requiring that the funds be used within the Commonwealth. Given that the Consent Decree is silent as to who is to control or administer the endowment and is also silent on geographic limitations on the use of the funds, the Endowment Act's impact on the Consent Decree is not substantial.[20]

▮ Further, the application of Act 10A to the Consent Decree does not violate the Contracts Clause. Importantly, Act 10A was signed into law by the Governor on July 2, 2012 and became effective immediately. The Consent Decree was executed on July 23, 2012. Thus, the enactment of Act 10A did not affect "a change in the law [which] impaired [the Consent Decree]," since the law was in effect at the time the Consent Decree was executed. *Transp. Workers Union of Am., Local 290*, 145 F.3d at 621. Further, even if the Consent Decree had preceded the enactment of Act 10A, the Consent Decree does not apply monies for a purpose prohibited by Act 10A.[21] Because neither the Endow-

---

20. Had this Court concluded that the Endowment Act substantially impaired the contract, based upon the pleadings we would overrule the preliminary objection because "the law at issue has a legitimate and important public purpose and ... the adjustment of the rights of the parties to the contractual relationship was reasonable and appropriate in light of that purpose." *Transp. Workers Union of*

*Am., Local 290*, 145 F.3d at 621. We would "defer to the legislative judgment concerning the importance of the public purpose and the manner in which that purpose is being pursued." *Id.*

21. Notably, Act 10A does not impose any reporting mandates upon the NCAA, as Act 10A

ment Act nor Act 10A clearly, palpably and plainly violate the U.S. and Pennsylvania Constitutions, we overrule the NCAA's fourth preliminary objection.

For all of the above reasons, the NCAA's preliminary objections to Plaintiffs' Second Amended Complaint are overruled.

Judge BROBSON did not participate in the decision in this case.

### ORDER

AND NOW, this 4th day of September, 2013, the National Collegiate Athletic Association's preliminary objections are overruled. The National Collegiate Athletic Association is ordered to file its answer within 20 days of this order.

DISSENTING OPINION BY President Judge PELLEGRINI.

Because Section 3(a) of the Institution of Higher Education Monetary Penalty Endowment Act (Endowment Act)[1] imposes a duty upon the Pennsylvania State University (PSU) as the primary payor, to deposit the penalty funds into an endowment that complies with the provisions of Section 3(b) of that Act, PSU is an indispensable party because it is PSU funds in PSU's possession that are to be paid under the "Binding Consent Decree Imposed by the National Collegiate Athletic Association [(NCAA)] and Accepted by [PSU]" (Consent Decree). Because PSU is an indispensable party and has not been sued

by either Senator Corman or Treasurer McCord, we lack subject matter jurisdiction and I would sustain the NCAA's preliminary objection and dismiss the Complaint.

A party is generally regarded to be indispensable "when his or her rights are so connected with the claims of the litigants that no decree can be made without impairing those rights." *City of Philadelphia v. Commonwealth*, 575 Pa. 542, 567, 838 A.2d 566, 581 (2003) (citation omitted). The failure to join an indispensable party to a lawsuit deprives the court of subject matter jurisdiction and may be raised at any time or by the court *sua sponte*. *Polydyne, Inc. v. City of Philadelphia*, 795 A.2d 495, 496 (Pa.Cmwlth.2002).

The basic inquiry in determining whether a party is indispensable concerns whether justice can be done in the party's absence. *City of Philadelphia*, 575 Pa. at 567, 838 A.2d at 581. The relevant analysis requires examination of the following factors:

1. Do absent parties have a right or interest related to the claim?

2. If so, what is the nature of that right or interest?

3. Is that right or interest essential to the merits of the issue?

4. Can justice be afforded without violating the due process rights of absent parties?

*Id.* at 567 n. 11, 838 A.2d at 581 n. 11 (citation omitted); *Polydyne, Inc.*, 795 A.2d at 496 n. 2 (citation omitted). In

---

specifically references PSU as having the obligation to file required statements.

1. Act of February 1, 2013, P.L. 1, 24 P.S. § 7503(a). Section 3(a) states:

 **(a) General rule.**—If an institution of higher education pays a monetary penalty pursuant to an agreement entered into with a governing body and:

(1) the monetary penalty is at least $10,000,000 in installments over a time period *in excess of one year;* and

(2) the agreement provides that the monetary penalty will be used for a specific purpose,

then the monetary penalty shall be deposited into an endowment that complies with the provisions of subsection (b).

undertaking this inquiry, the nature of the claim and the relief sought must be considered. *HYK Construction Co., Inc. v. Smithfield Township,* 8 A.3d 1009, 1015 (Pa.Cmwlth.2010), *appeal denied,* 610 Pa. 623, 21 A.3d 1195 (2011). Moreover, in an action seeking declaratory relief, "all persons shall be made parties who have or claim any interest which would be affected by the declaration." Section 7540 of the Declaratory Judgments Act, 42 Pa.C.S. § 7540(a).[2]

In this case, Senator Corman and Treasurer McCord ask this Court to declare that the Endowment Act requires that any and all of the penalty imposed by the Consent Decree be paid into the State Treasury. Under the Endowment Act, the "institution of higher education," in this case, PSU, has the responsibility to deposit the money into the fund. *See* Section 3(a) of the Endowment Act, 24 P.S. § 7503(a).[3] Even if PSU pays the penalty to the NCAA under the Consent Decree, it would not be relieved of that obligation under the Endowment Act, making PSU an indispensable party to the litigation.

**2.** As this Court has explained:

> While the Declaratory Judgments Act's joinder provision is mandatory, it is subject to reasonable limitations. *City of Philadelphia.* For example, where a declaratory judgment as to the validity of a statute or ordinance is sought, it is impossible to join as parties every single person whose interests are affected by the statute or ordinance. *Id.* Requiring the joinder of all such parties would undermine the litigation process and render the litigation unmanageable. *Id.* Additionally, where a person's official designee is already a party, the participation of such designee may alone be sufficient, as the interests of the two are identical, and thus, the participation of both would result in duplicative filings. *Id.; see Leonard v. Thornburgh,* [467 A.2d 104, 105 (Pa.Cmwlth.1983)] (holding that the Governor need not participate in litigation involving a constitutional attack upon

Moreover, Senator Corman's and Treasurer McCord's own prayer for relief seeks to order PSU to pay the first installment of the penalty funds directly to the State Treasury or to order the NCAA to deposit the first installment into the State Treasury following payment by PSU. Because PSU is not a party in this proceeding, we have no authority to grant the requested relief. *See generally Hansberry v. Lee,* 311 U.S. 32, 40, 61 S.Ct. 115, 85 L.Ed. 22 (1940). ("It is a principle of general application in Anglo–American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process. A judgment rendered in such circumstances is not entitled to the full faith and credit which the Constitution and statute of the United States ... prescribe, and judicial action enforcing it against the person or property of the absent party is not that due process which the Fifth and Fourteenth Amendments requires.") (citations omitted).

In response to this analysis, the majority goes to great lengths to ignore PSU's

> a tax statute, where his designee, the Secretary of the Department of Revenue, adequately represented his interests). Where the interest involved is indirect or incidental, joinder may not be required. *See, e.g., Mid–Centre County Authority v. Township of Boggs,* [384 A.2d 1008, 1012 (Pa.Cmwlth. 1978)] (concluding that Pennsylvania's Department of Environmental Resources was not a necessary party to a declaratory judgment action where its sole interest in the dispute concerned the identity of the party who would be responsible for complying with its regulations)....

*HYK Construction. Co., Inc.,* 8 A.3d at 1015–16.

**3.** *See also* Section 5 of the Endowment Act, 24 P.S. § 7505 ("[T]his act shall apply to all monetary penalties paid or payable under agreements between institutions of higher education and governing bodies regardless of the payment date.").

contractual and statutory duty to deposit the money owed by PSU to the NCAA that makes it an indispensable party. That position comes, in part, in its characterization of the agreement between PSU and the NCAA as a "Consent Decree" and applying the law regarding true consent decrees, ones approved by a court, which seemingly accepts the NCAA's position that it is some sort of non-state governmental actor. It is just a private contract between two parties—nothing more.

That analysis allows the majority to ignore that the requested declaration does impact PSU. Under the agreement, PSU agreed that it would pay $60 million in $12 million installments over a five-year period to the NCAA to be used for programs preventing child sexual abuse and/or assisting the victims of child sexual abuse. *See* Exhibit A to Second Amended Complaint at 5. If we were to grant the requested relief by issuing "[a]n order compelling the NCAA to ... direct payment of the first $12 million installment to the State Treasury....," PSU would be required to deposit the first $12 million payment and future $12 million payments not as provided for in the agreement, but into the Endowment Fund created under Section 3(b) of the Endowment Act, 24 P.S. § 7503(b), for programs or projects preventing child sexual abuse and/or assisting the victims of child sexual abuse. Because

the majority holds that the Endowment Act mandates do not unconstitutionally infringe on that agreement, PSU is bound by the mandates of the Endowment Act.

In addition, the NCAA falls within the definition of "governing body" and, as noted above, PSU falls within the definition of "institution of higher education," as those terms are defined in Section 2 of the Endowment Act, 24 P.S. § 7502, and the NCAA's and PSU's obligations thereunder are an "agreement" and "monetary penalty" within the provisions of Section 3(a), 24 P.S. § 7503(a). Thus, under Sections 3 and 5, 24 P.S. §§ 7503 7505, PSU has an independent statutory duty to deposit the funds to be paid under the Consent Decree into the Endowment Fund.

Because PSU's statutory and contractual liability with respect to funds in its possession are at the core of this case, PSU has a clear right or interest that is essential to the disposition of the issues and its interest is not currently represented by any of the other parties. PSU must be deemed to be an indispensable party in this case and due process requires its participation before any meaningful judicial relief may be granted. *See Columbia Gas Transmission Corp. v. Diamond Fuel Co.,* 464 Pa. 377, 379, 346 A.2d 788, 789 (1975).[4]

Accordingly, unlike the majority, I would sustain the NCAA's preliminary objection based on Senator Corman's[5] and

---

**4.** *See also Mains v. Fulton,* 423 Pa. 520, 523, 224 A.2d 195, 196 (1966) (holding that a declaratory judgment action brought by subdivision developers to determine whether a public utility possessed an easement across the lots in the development would not lie where all of the lot owners in the development had an interest and all of the owners were not joined in the proceeding).

**5.** While I agree with the Majority's determination that Treasurer McCord has standing to obtain relief under the Second Amended Complaint, I do not believe that Senator Cor-

man has legislative standing in this case. As the Pennsylvania Supreme Court has explained:

> An individual can demonstrate that he has been aggrieved if he can establish that he has a substantial, direct and immediate interest in the outcome of the litigation. A party has a substantial interest in the outcome of litigation if his interest surpasses that "of all citizens in procuring obedience to the law." "The interest is direct if there is a causal connection between the asserted violation and the harm complained of; it is

Treasurer McCord's failure to join PSU as an indispensable party and I would dismiss their Complaint because this Court lacks subject matter jurisdiction.[6]

immediate if that causal connection is not remote or speculative."
*Fumo v. City of Philadelphia*, 601 Pa. 322, 336–37, 972 A.2d 487, 496 (2009) (citations omitted). Senator Corman claims that he has a direct interest in the Endowment Act's enforcement and administration because, as the Senate Appropriations Committee Chair, he one of the numerous members of the General Assembly listed in Section 4(b)(1) and (2) of the Endowment Act, 24 P.S. § 7504(b)(1) and (2), that compose a panel that is entitled to notice of the Pennsylvania Commission on Crime and Delinquency's proposed disbursements from the Endowment Fund and to receive the Commission's annual report of all such expenditures. (Second Amended Complaint ¶ 51.) Under *Fumo* and *Pennsylvania Game Commission v. Department of Environmental Resources*, 521 Pa. 121, 127–28, 555 A.2d 812, 815 (1989), the Pennsylvania Commission on Crime and Delinquency has standing in this matter as the agency the General Assembly statutorily invested with the direct duties and responsibilities in disbursing the Endowment Fund. However, the panel, of which Senator Corman is a member, does not have the substantial, direct or immediate interest to support legislative standing with respect to the instant action involving the deposit of the penalty funds in the State Treasury under the Endowment Act because it only has review and comment powers on the Commission's actions under Section 4(b)(1) and (2) to propose corrective legislative action. *See, e.g., Fumo*, 601 Pa. at 347, 972 A.2d at 502 ("[I]n this claim, the state legislators allege only that the City did not act properly in exercising its statutory authority to license. The claim reflects nothing more than the state legislators' disagreement with the way in which the Commerce Director interpreted and executed her duties on behalf of the City. The claim does not demonstrate any interference with or diminution in the state legislators' authority as members of the General Assembly. As such, Claim II is only a generalized grievance about the conduct of government that all citizens share. Thus, we conclude that the state legislators lack standing to pursue Claim II."). Even if the panel would have the requisite interest, Senator Corman is merely a member of that panel and one member of the body does not have standing to enforce. Accordingly, unlike the majority, I would sustain the NCAA's preliminary objection with respect to Senator Corman's standing in this matter.

6. Because we lack subject matter jurisdiction, I would not reach the merits of the claims raised in the Complaint.