J-A09039-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| DAVID SAWYER AS THE ADMINISTRATOR OF THE ESTATE OF MARY E. SAWYER, DECEASED | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : | |
| v. | : : | |
| RITA SAWYER, M.D. | : : | |
| Appellee | : | No. 809 MDA 2016 |

Appeal from the Order Entered May 3, 2016
In the Court of Common Pleas of Lebanon County
Civil Division at No(s):  2005-00136

BEFORE:   GANTMAN, P.J., SHOGAN, J., and OTT, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED AUGUST 14, 2017**

Appellant, David Sawyer, as the administrator of the estate of Mary E. Sawyer, deceased, appeals from the order entered in the Lebanon County Court of Common Pleas, which granted the request of Appellee, Rita Sawyer, M.D., for reimbursement of an overpayment in connection with a wrongful death lawsuit settlement.

In its opinion filed May 3, 2016, the trial court accurately set forth the relevant facts and procedural history of this case.  Therefore, we just summarize them here.  The parties to this appeal are siblings.  In 2005, a jury convicted Appellee of first-degree murder and unlawful administration of a controlled substance by a practitioner, in connection with the death of the parties' mother, Mary E. Sawyer.  The trial court sentenced Appellee on

December 14, 2005, to life imprisonment for the murder conviction and imposed a concurrent sentence for the remaining conviction.

On January 24, 2005, Appellant, as administrator of his mother's estate, filed a civil complaint against Appellee for assault, wrongful death, and survival. After the pleadings and discovery closed, on September 26, 2007, Appellant filed a motion for partial summary judgment on the issue of liability based on Appellee's murder conviction. Appellee filed her response in opposition on October 22, 2007. On November 7, 2007, the court granted summary judgment in Appellant's favor on the issue of liability.

In or around December 2007, Appellant established a Pennsylvania non-profit foundation in memory of the parties' deceased parents ("Foundation"). Appellant intended to fund the Foundation with proceeds from the civil lawsuit against Appellee.

On September 13, 2011, the parties settled the case. The terms of the settlement agreement ("Agreement") obligated Appellee to make certain cash payments to the decedent's estate; and to pay the remainder of the settlement amount by way of financial transfers to the Foundation.[1] Pursuant to the Agreement, Appellee was to make the financial transfers within thirty (30) days and the cash payments within ninety (90) days. Due to the complexity of tax related issues surrounding the transfers as well as

---

[1] The settlement agreement is marked confidential, and the trial court has sealed the record.

Appellee's incarceration, Appellee could not make all of the transfers within that timeframe. Appellant's counsel agreed to a delay of some of the transfers until Appellee's counsel received answers from the Internal Revenue Service ("IRS") regarding the relevant tax issues. Appellee ultimately completed the transfers required under the Agreement by February 2013.

On July 26, 2013, Appellee's counsel sent Appellant's counsel a written request for reimbursement of overpaid settlement funds. Specifically, Appellee's counsel claimed he had inadvertently overfunded the Foundation by approximately $35,000.00. Appellant's counsel acknowledged the overpayment but insisted for the first time that Appellee owed interest for the delay in performance under the Agreement.

On January 29, 2014, Appellee filed a "motion for a status conference." Appellee alleged various issues had arisen within respect to overpayment of the amount specified in the Agreement which the parties had been unable to resolve and that a status conference was necessary to discuss these outstanding issues. The trial court scheduled a status conference for March 7, 2014. After discussing the outstanding issues with the court in chambers, the court conducted hearings on the disputed issues on September 4, 2014, April 2, 2015, and November 30, 2015. During the hearings, Appellant argued that Appellee's overpayment as well as other payments made pursuant to the Agreement were designated as "charitable

deductions" on her tax returns, precluding Appellee from requesting any reimbursement if those payments were made with the donative intent necessary to take a charitable deduction.[2] At the conclusion of the hearings, the court ordered the parties to submit post-hearing briefs limited to four issues: (1) did Appellant's counsel need express authority from Appellant to agree to extend the time for performance under the Agreement; (2) could Appellee's counsel rely on the apparent authority of Appellant's counsel to delay performance under the Agreement; (3) could the settlement amount be deemed a "gift"; and (4) what is the import of declaring a transfer as a charitable deduction.

Following the submission of post-hearing briefs on the issues, by order dated April 28, 2016 and filed on May 3, 2016, the trial court granted in part and denied in part Appellee's request for reimbursement. The trial court rejected Appellant's argument that Appellee's designation of settlement payments as "charitable deductions" on her tax return precluded reimbursement. The court decided Appellee's overpayment to the Foundation was merely inadvertent. Regarding whether Appellee owed interest, the court found the parties had agreed Appellee could delay some transfers until the IRS answered certain tax inquiries, which the IRS

_____

[2] Upon discovery of the overpayment, Appellee's counsel amended Appellee's tax return to remove the overpaid amount from Appellee's list of charitable deductions.

provided around June 2012. Nevertheless, the court found Appellee's delay in payments after July 2012, should be subject to interest. The court issued a final order, directing Appellant to remit $28,422.85 to Appellee within 60 days for the overpayment,[3] which was the amount of overpayment requested, less $6,831.15 in interest accumulated from July 2012 to February 2013.[4]

Appellant timely filed a notice of appeal on May 20, 2016. On May 23, 2016, the trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant timely complied on June 10, 2016.

Appellant raises five issues for our review:

> DID THE TRIAL COURT [ERR] BY FAILING TO FIND THAT [THE FOUNDATION] WAS A NECESSARY AND INDISPENSABLE PARTY TO THIS ACTION?
>
> DID THE TRIAL COURT [ERR] BY ORDERING [APPELLANT], ADMINISTRATOR OF THE ESTATE OF MARY E. SAWYER TO REPAY FUNDS THAT [APPELLANT], ADMINISTRATOR OF THE ESTATE OF MARY E. SAWYER DID NOT RECEIVE?
>
> DID THE TRIAL COURT [ERR] BY NOT FINDING THAT [APPELLEE], RITA SAWYER [CAN ONLY] RECOVER AGAINST THE [FOUNDATION]?
>
> DID THE TRIAL COURT [ERR] BY FAILING TO FIND THAT

---

[3] The court directed "[Appellant] and/or [the] Foundation" to remit payment. (Opinion in Support of Order, filed May 3, 2016, at 40).

[4] Appellee did not file a cross-appeal challenging the amount of interest owed.

THE [FOUNDATION] WAS THE PARTY WHO ACTUALLY BENEFITTED AND WHO APPRECIATED SUCH BENEFIT FROM THE ALLEGED OVERPAYMENT?

DID THE TRIAL COURT [ERR] BY FAILING TO FIND THAT THE ADDITIONAL $140,000.00 WHICH [APPELLEE] CLAIMED ON HER 2012 AMENDED FEDERAL INCOME TAX RETURN WAS CHARITABLE CONTRIBUTIONS AND COULD NOT BE USED TO OFFSET AMOUNTS DUE PURSUANT TO THE MEDIATION AGREEMENT?

(Appellant's Brief at 4).

In Appellant's first four issues,[5] he argues jurisdiction is improper in this case because Appellee failed to join the Foundation as an indispensable party to this action. Appellant contends the court intended for the Foundation to reimburse Appellee for the overpayment; but the court's order actually directed Appellant, as administrator of his mother's estate, to remit payment to Appellee. Appellant claims he did not personally receive the overpayment, and the Foundation was the entity that directly benefitted from the overpayment. Appellant insists the Foundation is therefore an indispensable party to this appeal. Appellant concedes he raises for the first time on appeal his claim that Appellee failed to join the Foundation as a necessary party to this action, but he maintains that claim is non-waivable

_____

[5] Notwithstanding Appellant's number of questions presented, Appellant combines issues one through four in one argument section, in contravention of the rules of appellate procedure. *See* Pa.R.A.P. 2119(a) (stating argument shall be divided into as many parts as there are questions to be argued and shall have at head of each part, in distinctive type, particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent).

under Pennsylvania law. Appellant concludes the trial court lacked jurisdiction, and this Court should vacate the trial court's order and dismiss Appellee's request for reimbursement. We disagree.

Pennsylvania Rule of Civil Procedure 1032 provides, in relevant part:

**Rule 1032. Waiver of Defenses. Exceptions. Suggestion of Lack of Subject Matter Jurisdiction or Failure to Join Indispensable Party**

\* \* \*

(b) Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter or that there has been a failure to join an indispensable party, the court shall order that the action be transferred to a court of the Commonwealth which has jurisdiction or that the indispensable party be joined, but if that is not possible, then it shall dismiss the action.

Pa.R.C.P. 1032(b). "In Pennsylvania, an indispensable party is one whose rights are so directly connected with and affected by litigation that [the entity] must be a party of record to protect such rights[.]" ***Columbia Gas Transmission Corp. v. Diamond Fuel Co.***, 464 Pa. 377, 379, 346 A.2d 788, 789 (1975). "The absence of an indispensable party goes absolutely to the court's jurisdiction. If an indispensable party is not joined, a court is without jurisdiction to decide the matter. The absence of an indispensable party renders any order of the court null and void." ***Sabella v. Appalachian Development Corp.***, 103 A.3d 83, 90 (Pa.Super. 2014), *appeal denied*, 631 Pa. 744, 114 A.3d 417 (2015) (internal citation omitted). The failure to join an indispensable party is a non-waivable issue. ***Id.***;

*Fiore v. Oakwood Plaza Shopping Center, Inc.*, 585 A.2d 1012, 1020 (Pa.Super. 1991) (stating issue of failure to join indispensable party cannot be waived).

In determining whether a party is "indispensable," courts analyze: "(1) whether the party has a right or interest related to the claim; (2) the nature of the right or interest; (3) whether the right or interest is essential to the merits; and (4) whether justice can prevail without violating due process rights of the absent party." *Id.* "[T]he basic inquiry remains whether justice can be done in the absence of a third party." *Orman v. Mortgage I.T.*, 118 A.3d 403, 407 (Pa.Super. 2015). Significantly, not all parties or entities related to an action are "indispensable" parties. *Corman v. National Collegiate Athletic Ass'n,* 74 A.3d 1149 (Pa.Cmwlth. 2013). For example, "where a person's official designee is already a party, the participation of such designee may alone be sufficient, as the interests of the two are identical, and thus, the participation of both would result in duplicative filings." *Id.* at 1163. *See, e.g., City of Philadelphia v. Commonwealth*, 575 Pa. 542, 568, 838 A.2d 566, 582 (2003) (holding petitioners' failure to join all parties who were potentially affected by challenged legislation did not deprive Supreme Court of jurisdiction to review merits of petitioners' claims; requiring participation of all parties having any interest which could be potentially affected by invalidation of statute would be impractical; while legislation at issue purports to alter rights and

obligations of numerous persons, achieving justice is not dependent upon participation of all of those persons; complaint named as respondents Commonwealth and Governor, both of whom are represented by Attorney General who stands in representative capacity for, at minimum, all non-Commonwealth parties with interest in seeing statute upheld, and Presiding Officers and Minority Leaders of both Houses of General Assembly, who are capable of representing interests of Legislature as whole; substantial justice can be done without joining any parties other than those who are presently participating in litigation).

Instantly, the trial court analyzed Appellant's claims as follows:[6]

> From its inception, [the] Foundation in this case was controlled by [Appellant]. [Appellant's] lawyer created the Foundation and communicated all information about it to [Appellee] and her lawyer. Throughout the litigation during 2014 and 2015, [Appellant] and/or his attorney spoke for [the] Foundation and even raised issues on behalf of it.[1]
>
> > [1] For example, [Appellant] argued that interest should be paid to [the] Foundation during the period of time when [Appellee] delayed payment of what she owed.
>
> As we see it, [Appellant] is the "official designee" for [the] Foundation. Moreover, [Appellant's] interest and the interest of [the] Foundation are identical. As such, [Appellant's] participation in the litigation that has progressed since 2014 is sufficient to protect [the]

_____

[6] Given the existing legal precedent, we bypass the trial court's initial conclusion of waiver and move directly to the court's resolution of the dispute on the merits. **See Sabella, supra**; **Fiore, supra**.

Foundation and its interests. Reversing the decisions we have already rendered regarding the overpayment because [the] Foundation was not a party would do nothing more than result in "duplicative litigation." Accordingly, we believe that all components of the legal principle articulated in **Corman** and **City of Philadelphia**…apply in this case. So too should the conclusion of those cases apply—[the] Foundation should not be declared an indispensable party.

(Trial Court Opinion, filed July 12, 2016, at 7-8) (internal capitalization omitted). We agree with the court's decision. The trial court's order directed "[Appellant] and/or the Foundation" to remit payment to Appellee. The record makes clear the court expected Appellant to make that payment from the Foundation, which Appellee had inadvertently overfunded. Appellant admits he is the Board President, Treasurer, and Founding Director of the Foundation. The record confirms Appellant is the individual who speaks for and on behalf of the Foundation; in other words, Appellant is the "official designee" of the Foundation. No violation of the Foundation's due process rights occurred because Appellant represented the Foundation's interest at each of the hearings. **See Fiore, supra**. **See also Orman, supra**. Under these circumstances, the Foundation was not an indispensable party that deprived the court of jurisdiction. **See City of Philadelphia, supra**; **Corman, supra**. Therefore, Appellant's issues one through four merit no relief.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Bradford H.

- 10 -

Charles, we conclude Appellant's fifth issue merits no relief. The trial court opinion comprehensively discusses and properly disposes of that question. (*See* Opinion in Support of Order at 27-33; 40-41) (finding: Appellee's counsel characterized some of settlement payments as "charitable contributions" on Appellee's tax return because that benefited Appellee from tax standpoint, where ultimate purpose of Foundation was to be benevolent, and based on advice that IRS would likely approve such characterization; upon discovery of $35,254.55 overpayment, Appellee's counsel amended her 2012 tax return to delete that overpayment from list of charitable contributions; Appellee's decision to pay Foundation was motivated by desire to resolve wrongful death lawsuit and was not act of "disinterested generosity"; whether Appellee should or will be required to pay additional taxes based upon her tax filing characterizations is issue to be addressed between Appellee and IRS; court rejected Appellant's argument that Appellee's attempt to claim some of her settlement payments as charitable deductions precluded court from determining that $35,254.55 was mistaken overpayment; Appellee's counsel credibly testified regarding inadvertent overpayment; court was convinced without doubt that Appellee mistakenly overfunded Foundation by $35,254.55, and that Appellee had no donative intent to contribute that amount gratuitously to Foundation; to permit Appellant to take advantage of Appellee's overpayment would be unjust; principles of equitable restitution apply; Appellee established both mistake of

fact and consequential unjust enrichment; thus, Appellee was entitled to return of overpayment (less interest)). Therefore, with respect to Appellant's fifth issue on appeal, we affirm on the basis of the trial court's May 3, 2016 opinion.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/14/2017

ORIGINAL

IN THE COURT OF COMMON PLEAS OF
LEBANON COUNTY, PENNSYLVANIA

CIVIL ACTION – LAW

DAVID SAWYER AS THE : No. 2005-00136
ADMINISTRATOR OF THE :
ESTATE OF MARY E. SAWYER, :
Deceased, :
　　　　　Plaintiff :
:
v. :
:
RITA SAWYER, M.D., :
　　　　　Defendant :

## ORDER OF COURT

AND NOW, to wit, this 28th day of April, 2016, upon consideration of everything presented by the parties and in accordance with the attached Opinion of the Court, the Defendant's motion seeking return of an overpayment is GRANTED in part and DENIED in part. Within 60 days, Plaintiff is to remit to Defendant the sum of $28,422.85.

To preserve the parties' confidentiality agreement, this Opinion is to be filed under seal and is not to be disseminated to the public absent another Court Order.

BY THE COURT,

_____, J.
BRADFORD H. CHARLES, Judge

1

## CIVIL ACTION – LAW

| | |
|---|---|
| DAVID SAWYER AS THE ADMINISTRATOR OF THE ESTATE OF MARY E. SAWYER, Deceased,<br>              Plaintiff | : No. 2005-00136 |
|       v. | : |
| RITA SAWYER, M.D.,<br>            Defendant | : |

**APPEARANCES:**

| | |
|---|---|
| Alan B. Kane, Esquire<br>LAW OFFICES OF<br>ALAN B. KANE | For David Sawyer, as Administrator<br>of the Estate of Mary E. Sawyer |
| Thomas J. Weber, Esquire<br>GOLDBERG KATZMAN | For Rita Sawyer |

## Opinion, Charles, J., April 28, 2016

Before us is a dispute over the amount and timing of a settlement payment. Defendant Rita Sawyer, M.D. (hereafter "RITA") alleges that she mistakenly overpaid the agreed-upon settlement amount by $35,254[1] and that the overpayment should be returned. In response, David A. Sawyer, Administrator of the Estate of Mary A. Sawyer (hereafter "DAVID") responds that RITA did not pay the settlement proceeds in a timely manner and that she should pay interest that accumulated during the period of delay. To complicate the arguments of the parties outlined above, RITA declared the

---

[1] The actual amount is $35,254.55. To save paper and space, we will not hereafter mention the 55 cents.

1

settlement amount to be a "charitable contribution" on her tax return, and this has prompted DAVID to declare that the overpayment made by RITA was simply a charitable gift.

Even though the amount of RITA's overpayment represented only a very small percentage of the overall settlement reached in the above-referenced case, the acrimony between RITA and DAVID is so intense that these parties have spent almost two years fighting over the issues outlined above. Following multiple day-long hearings and receipt of lengthy depositions transcripts, we are finally able to adjudicate the parties' dispute. We will do so via this Opinion.

## I.     GLOSSARY OF TERMS AND KEY PARTICIPANTS

When attending a sporting event, it is sometimes helpful to have a scorecard in order to identify the players by their numbers. Because there are so many lawyers involved in this dispute, and because the role of each can sometimes be confusing, we have endeavored to create our own "scorecard" to identify key personnel relevant to this dispute. The list we have identified is as follows:

(1)   FOUNDTATION - Charles F. Sawyer and Mary Esther Sawyer Foundation – Charitable foundation set up by DAVID to accept and administer distribution of funds paid by RITA.

(2)   PARKER - Wiley Parker, Esquire – PARKER was not involved as an advocate in the above-captioned litigation. However, PARKER was

2

named as RITA's Power of Attorney and was responsible for effectuating the terms of the settlement reached by DAVID and RITA.

(3) WEBER - Thomas J. Weber, Esquire – WEBER represented RITA as an advocate in the above-referenced litigation.

(4) DOWLING - David B. Dowling, Esquire – DOWLING represented DAVID as an advocate in the above-referenced litigation.

(5) KANE - Allen Kane, Esquire – KANE now represents DAVID. KANE became involved as DAVID's attorney at some point during August of 2013.

(6) MAIORIELLO - John Maioriello, Esquire – An attorney who was involved on behalf of DAVID in the receipt of settlement payments.

(7) SEIBERT - Ken Seibert – An accountant who practices in Lebanon and who was consulted by PARKER.

(8) KATZ - Irwin Katz – An accountant hired by DAVID to provide an opinion regarding this dispute.

## II. PROCEDURAL BACKGROUND

In 2005, DAVID sued his sister RITA in his capacity as Administrator of the Estate of Mary E. Sawyer. The lawsuit arose from the death of Mary Sawyer on June 20, 2004. In the Complaint, DAVID alleged that RITA had administered a narcotic medication to Mary and caused her death. The Complaint further referenced Criminal Homicide charges that were filed against RITA as a result of Mary's death. Because RITA was subsequently

3

convicted of these Criminal Homicide charges, DAVID alleged that her liability was established, and this Court ultimately agreed.

A trial regarding damages was ordered by President Judge John C. Tylwalk on November 7, 2007. Before this trial could be conducted, the parties mediated their dispute over how much money RITA should pay to DAVID in his capacity as Administrator of Mary's Estate. Ultimately, a settlement was reached. The key terms of the settlement were as follows:

- DAVID would create a foundation entitled "Charles F. Sawyer and Mary Esther Sawyer Foundation." DAVID would administer FOUNDATION but would not receive any compensation from FOUNDATION for his administrative duties.

- RITA would pay two million dollars to DAVID's lawyer and to FOUNDATION. FOUNDATION would then expend monies in Lebanon County and Westmoreland County for charitable purposes.

- The agreement stated "The cash proceeds of this settlement are to be paid by the Defendant to the Plaintiff within 90 days from today's date. The in-kind portion of this settlement shall be transferred within 30 days."

- DAVID agreed not to interfere with any of RITA's efforts to appeal or collaterally attack her criminal conviction.[2]

---

[2] None of the parties dispute the material terms of the settlement reached at mediation.

4

Following the parties' settlement on September 13, 2011, numerous issues arose. In early 2014, the parties communicated to the Court that RITA had not complied with the time deadline for payment of money that had been agreed upon. In addition, DAVID for the first time took the position that he should not be bound by the paragraph of the agreement precluding him from making a recommendation should RITA seek to overturn her conviction through collateral attack. On March 7, 2014, we issued a Court Order permitting the parties to conduct discovery regarding the timing of the settlement payments. We solicited Briefs regarding DAVID's effort to declare the "no recommendation" clause of the settlement agreement to be void. As part of the briefing process, RITA filed a motion seeking to declare the entire settlement to be null and void "in the event the Court declares paragraph 3 of the Mediation Memorandum [pertaining to non-recommendation] unenforceable."

On July 11, 2014, this Court entered an *en banc* decision to deny DAVID's effort to declare a portion of the settlement to be void. Emphasizing that the parties' agreement did not and would not prevent DAVID from cooperating with law enforcement officials by providing testimony or evidence when required to do so, we concluded:

> There is a vast difference between providing true testimony when requested and gratuitously offering one's recommendation to prosecutors and courts. Especially in a situation where DAVID has already had the opportunity to speak at Defendant's sentencing hearing and where the resulting sentence has withstood appellate an PCRA scrutiny, we cannot and will not declare DAVID's non-recommendation agreement to be contrary to Pennsylvania public policy.

5

(Slip Opinion at pg. 9).

We began to accept factual testimony regarding the issues surrounding payment of the settlement amounts on September 4, 2014. After a full day, it became apparent that we had not allotted enough time. Therefore, additional testimony was received at a hearing that was conducted on April 2, 2015. Thereafter, DAVID wanted to conduct a deposition of RITA. We somewhat reluctantly agreed. On January 22, 2016, RITA's deposition was conducted at the Muncy State Correctional Facility. The transcript from that deposition was forwarded to this Court several months later. Briefs, counter-briefs and reply briefs were then filed by both parties. The final brief was received in late March. The issues in dispute between the parties are now before us for a decision.

### III. FACTS

At the various hearings over which we presided, we learned that RITA had named PARKER as her Power of Attorney (Exh. 1). PARKER was authorized to "perform all matters and things, transact all business, make, execute and acknowledge all contracts, orders, deeds, writings, assurances and instruments with the same powers, and to all intents and purposes with the same validity as I could if personally present . . ." (Exh. 1). In his capacity as Power of Attorney, PARKER was charged with the responsibility to effectuate the terms of the settlement that had been reached on September 11, 2011. (See Exh. 2).

6

With the above in mind, we will set forth a chronological outline of what occurred after the September 11, 2011 settlement. Although there were relatively few factual disputes, we emphasize that the chronology we will articulate below represents our determination of the facts that we have found to be credible:

- 9/15/11 – WEBER forwards to PARKER the Mediation Memorandum setting forth the terms of the parties' settlement. Tax issues are discussed in the letter. (Exh. 2).

- 10/11 to 12/11 – PARKER and DOWLING communicate on unknown dates about transferring funds and assets to comply with the parties' settlement. An agreement was reached to hold the transfer of funds "in abeyance." In his testimony, DOWLING acknowledged that he was acting on behalf of DAVID when he agreed to delay the transfer of settlement funds. DOWLING stated that he entered into this agreement in order to maximize the tax benefits that would accrue to his client. DOWLING also indicated that PARKER was "cooperative and eager to consummate the settlement." DOWLING did not perceive that PARKER nefariously sought to delay the transfer of settlement funds in contravention of the parties' settlement agreement; delays were caused by a sequence of issues that arose. During the discussions between DOWLING and PARKER where the agreement was reached to hold transfer of funds "in abeyance," no discussion of interest was ever undertaken.

7

- 11/29/11 – PARKER writes letter to WEBER and DOWLING regarding tax issues pertaining to the settlement. (Exh. 3).

- 11/29/11 – PARKER writes letter to DOWLING asking for information regarding FOUNDATION. PARKER states: "As soon as I am provided with the above information, I will take the steps necessary to liquidate assets necessary to fund the cash portion of the payment and transfer other mutual funds or securities." (Exh. 4).

- 12/2/11 – DOWLING writes a letter to PARKER. This letter states, inter alia: "Incidentally, this amount was to have been paid to [FOUNDATION] within 30 days of settlement. We agreed to hold this in abeyance until we know exactly what should be transferred to [FOUNDATION]." The letter also indicates that the cash available to RITA of $693,461.41 should be paid to FOUNDATION on or before December 11, 2011. Within this letter, tax issues are also addressed. (See Exh. 5).

- 12/2/11 – DOWLING writes a letter to PARKER with 65 pages of attachments. This letter advises PARKER of the existence of FOUNDATION and attaches documentation regarding the creation and purpose of FOUNDATION. (Exh. 5).

- 12/9/11 – PARKER forwards a check in the amount of $693,461.41 to DOWLING. (Exh. 6).

- 12/11 to 2/12 – During this period of time, DOWLING attempts to obtain information from the Department of Revenue necessary to

8

effectuate the tax strategy that has been developed with respect to the in-kind transfer of settlement assets. DOWLING testified that at one point, the Department of Revenue lost all documents regarding the Sawyer settlement and DOWLING was required to re-send those documents. DOWLING testified: "I tried to prod the Department of Revenue, but it would not be rushed."

- 2/27/12 – PARKER sends an email to DOWLING asking if DOWLING had heard anything from the Department of Revenue. (Exh. 7).

- 3/20/12 – DOWLING writes a letter to PARKER stating: "We have not received final approval from the Department of Revenue, but expect they will approve the petition [for approval of settlement] as prepared . . . As soon as I receive final word from the Department of Revenue, I will notify you that these amounts are indeed correct." (Exh. 8).

- 3/20/12 – PARKER writes an email to DOWLING. In that letter, PARKER states: "I am certainly prepared to send you a check in the amount requested to address the inheritance tax once you receive approval from the Department of Revenue. As to the balance, it is my intention, consistent with the Mediation Memorandum entered by Judge Charles, to transfer the balance of the monies, in kind, to [FOUNDATION] . . ." (Exh. 9).

- 3/28/12 - PARKER writes another letter to DOWLING in which he states "We would like to accomplish the transfers promptly. If I do

9

not hear from you within the next 10 days in that regard, I will seek a meeting with Judge Charles." (Exh. 10).

- 4/6 to 4/9/12 – Emails are sent between PARKER and MAIORIELLO regarding how the transfer of in-kind assets is to be effectuated. This communication represented the first contact between PARKER and MAIORIELLO. At the time of this email chain, RITA possessed funds with five or six investment firms and each of these firms had to be contacted with respect to the in-kind transfer of settlement assets. (Exh. 11-12).

- 4/13/12 – PARKER sends email to MAIORIELLO indicating that he plans to obtain the necessary signatures to transfer funds and that he hoped to "have everything wrapped up within about two weeks." (Exh. 13).

- 4/20/12 – PARKER forwards the necessary account transfer forms to Charles Schwab and Company, which was the agency designated by MAIORIELLO. (Exh. 14).

- 5/1/12 – Schwab would not accept the transfer forms proffered by PARKER because those forms were not signed directly by RITA. Schwab would not accept PARKER's signature as an agent for RITA. On this same date, PARKER emails MAIORIELLO asking him to have DOWLING "figure out" what was needed to transfer funds. (Exh. 14-15).

- 5/7/12 – The Pennsylvania Department of Revenue approves the allocation of the settlement proceeds between the wrongful death and survival actions in accordance with the proposal submitted by DAVID. (Exh. 31).

- 5/8/12 – MAIORIELLO sends new transfer documents to PARKER.

- 5/10/12 – PARKER writes to MAIORIELLO indicating that the form required by C. Rowe Price required a signature guaranty which could not be obtained from RITA because she was incarcerated. In addition, the transfer forms identified DAVID as the "new owner" and PARKER objected to this characterization because the settlement required that funds be paid to FOUNDATION. (Exh. 17).

- 5/14/12 – PARKER forwards forms to RITA for her to sign.

- 5/25/12 – PARKER forwards fully executed Powers of Attorney to MAIORIELLO regarding four separate investment accounts. PARKER states: "I am assuming that these documents can be utilized together with the Schwab documents I previously provided you to accomplish the transfer of the appropriate funds." (Exh. 19).

- 5/30/12 – PARKER writes that he could not obtain proper signatures on the American Century transfer form because it was impossible to obtain a signature guaranty from RITA while she was in prison. (Exh. 20).

11

- June of 2012 – A "flurry of transfers" occur. The following represents a list of all assets transferred in cash or in kind between RITA, the Estate of Mary Sawyer and FOUNDATION:

| Date of Transfer | Source of Transfer | Amount |
|---|---|---|
| 12/9/11 | Cash | $693,461.41 |
| 6/7/12 | Newburger Fuhrman Account | 237,581.64 |
| 6/7/12 | Transfer Fidelity Account | 68,023.88 |
| 6/8/12 | Dreyfus Account | 77,146.87 |
| 6/8/12 | Vanguard Energy Account | 369,204.57 |
| 6/8/12 | Vanguard Index Account | 39,365.75 |
| 6/8/12 | Vanguard PA.L.T. | 52,802.28 |
| 6/8/12 | Vanguard Dividend | 51.92 |
| 6/8/12 | Vanguard Value Index Fund | 40,264.18 |
| 6/20/12 | American Century Short Term Government Bonds | 35,254.55 |
| 7/9/12 | T. Rowe Price Stock Fund | 65,970.43 |
| | **TOTAL:** | **$1,679,127.48** |

- 6/22/12 – PARKER writes letter to DOWLING advising DOWLING of the progress of transferring funds. PARKER reiterates that he is not able to obtain a signature guaranty from RITA because she is in prison and this has prevented him from completing several of the transfer forms that had been forwarded by MAIORIELLO. (Exh. 22).

12

- 7/3/12 – PARKER and MAIORIELLO communicate regarding transfer of remaining assets. As a result of this email chain, the parties seem to reach consensus that a Court Order will have to be obtained to effectuate the transfer of additional funds. (Exh. 24).

- 9/4/12 – PARKER forwards an additional check in the amount of $140,000.00 to FOUNDATION. Parker indicates that $197,760.60 remains to be paid to effectuate the settlement. (Exh. 25).

- 9/7/12 – PARKER forwards an additional $48,111.11 to DAVID's attorneys.

- 11/27/12 – MAIORIELLO writes to PARKER to inquire about the remaining funds that are due and owing. PARKER responds that monies will have to be accessed from RITA's retirement accounts and he states: "I would like to get that transfer in before the end of the year for tax purposes, given the transfers to date. I would appreciate it if you would confirm for me that you would agree to refund to RITA any amounts in excess of two million dollars that might be moved into the foundation using this method. I will give you a call this afternoon to discuss these issues." (Exh. 26).

- 12/7/12 – PARKER writes letter to RITA attaching a copy of a recapitulation of payments made up to that point in time. PARKER states "We still owe approximately $168,015.96." (Exh. 27).

- 12/13/12 – PARKER forwards recapitulation of payments to MAIORIELLO and asks for confirmation that MAIORIELLO's records comport with PARKER's recapitulation. (Exh. 28).

- 12/20/12 – MAIORIELLO writes to PARKER stating "It appears to me that your figures are accurate." (Exh. 28).

- 2/23/13 – PARKER forwards check to MAIORIELLO in the amount of $168,015.96. PARKER writes that this check "represents the final payment of settlement of the above-referenced litigation." (Exh. 30).

- 7/26/13 – PARKER writes a letter to MAIORIELLO indicating that there was an overpayment of $35,254.55. He indicates that the recapitulation that he prepared and sent in December of 2012 was erroneous. PARKER wrote:

  > This overpayment clearly occurred because of my oversight, however the Foundation has no legal basis upon which to retain these monies and I am hereby demanding that the Foundation return [the overpayments].

  (Exh. 33).[3]

- 8/21/13 – KANE is hired by DAVID. KANE states in a letter to PARKER "If your letter is correct and your client was not given credit for $40,264.18, then such credit will be given." (Exh. 34).

- 9/24/13 – KANE acknowledges in a letter to PARKER that the sum of $35,254 has been overpaid. However, KANE asserts that interest on

---

[3] PARKER's letter references $40,264.18. This was an error. In his testimony, PARKER acknowledged that the correct amount of the overpayment was $35,254.55 and that his letter of July 26, 2013 should have referenced this amount.

the delay in forwarding settlement proceeds should be considered. KANE estimates that interest in the amount of $62,812.00 accrued as a result of the delay in paying settlement funds. KANE demands that RITA forward an additional $27,557.00 to cover the amount of this interest. (Exh. 35)

- 9/26/13 – PARKER writes to KANE to complain that the issue of interest was never raised until KANE's September 24, 2013 letter. PARKER writes: "If I had any inkling that the problems encountered in the transfers were going to result in the type of claim asserted in your letter, I would have been in front of the Judge a long time ago." (Exh. 36).

- October 2013 – January 2014 – Various letters and emails are sent between KANE and PARKER that could be fairly characterized as "posturing."

- 1/28/14 – PARKER requests a status conference before this Court to address the issues pertaining to the overpayment of settlement funds and DAVID's request for interest. This Motion for Status Conference effectively initiated the litigation that will now be resolved by the Opinion and Court Order we will enter today.

With respect to the consummation of the parties' settlement, we reach the following findings of fact:

(1) DOWLING and PARKER reached an agreement to delay payment of settlement proceeds. This agreement benefited both parties, but for different reasons.

(2) When DOWLING entered into the agreement to delay payment of settlement amounts, he was acting in his capacity as attorney for DAVID. At no time did DOWLING advise PARKER that he lacked the authority to delay consummation of the parties' settlement, nor did PARKER have any reason to doubt DOWLING's actual authority to do so.

(3) Because DAVID refused to waive the attorney-client privilege, there is no way for this Court to know whether or not DOWLING had express authority from DAVID to delay the payment of settlement amounts.

(4) The agreement between PARKER and DOWLING to delay transfer of settlement amounts was not limited by any time deadline.

(5) The payment of cash in the amount of $693,461.41 was paid in accordance with the terms of the parties' settlement on September 13, 2011.

(6) Transfer of in-kind assets was delayed for roughly eight months because Plaintiff could not receive an answer to tax inquiries submitted to the Pennsylvania Department of Revenue.

(7) Starting in June of 2012 when the Department of Revenue provided the needed information to Plaintiff, PARKER acted promptly and reasonably to transfer in-kind assets in accordance with the terms of

the settlement agreement and the extension agreement he had reached with DOWLING.

(8) PARKER did not file any motions with the Court to address the delay in transfer of settlement funds because he had reached an agreement to delay transfer with DOWLING and because no representative of DAVID ever complained about the delay or submitted a claim for interest on the amount due and owing.

(9) While the delay in payment up to July 9, 2012 was primarily driven by issue within the control of DAVID, the delay in payment after July 9, 2012 resulted from issues that were controlled by RITA.

While the settlement was in the process of being consummated, PARKER prepared tax returns for RITA in his capacity as Power of Attorney. To do this, PARKER used the Turbo Tax on line computer program. In addition, PARKER spoke with SEIBERT about the settlement, but he did not ask SEIBERT to provide a written opinion or sign the tax return as a preparer. Nothing was paid by PARKER to SEIBERT for the informal advice SEIBERT provided.

In the tax returns originally filed by PARKER on behalf of RITA, the settlement payments were characterized as charitable contributions. Of course, the characterization of these payments and transfers as "charitable" benefited RITA from a tax standpoint. PARKER testified that he felt the transfer could be characterized as "charitable" because the ultimate purpose of FOUNDATION was to be benevolent and because SEIBERT told

17

him that the IRS would likely approve such characterization. PARKER acknowledged that he did not affirmatively solicit a formal opinion from either the IRS or an accountant.

Once the $35,254 overpayment was discovered, PARKER amended RITA's 2012 tax return on September 22, 2014. The amendment deleted the $35,254 overpayment from the list of charitable contributions. (Exh. 44). The IRS subsequently acknowledged receipt of the amended return. (Exh. 51). PARKER never advised DAVID or FOUNDATION that RITA had claimed her payments as charitable deductions, nor did PARKER advise DAVID or FOUNDATION that he had amended the 2012 return to exclude $35,000.00 as a charitable deduction.

DAVID called KATZ as an expert witness regarding tax issues. KATZ is a tax attorney who was familiar with federal taxation law. KATZ characterized a charitable gift as "disinterested generosity." Relying upon several public legal decisions, KATZ opined that settlement of a law suit discharges a legal duty and cannot therefore be considered "charitable." KATZ opined that both RITA's 2012 tax return and her 2013 tax return were erroneously filed because the amounts paid by RITA to DAVID and FOUNDATION during those years could not in any way be construed as charitable contributions. In addition, KATZ stated that RITA's 2013 tax return was further flawed because it treated RITA's payments as contributions to a public charity, as opposed to a private foundation.[4]

---

[4] Apparently, a deduction of 50% from adjusted gross income can be used for a public charity, but a deduction of only 30% of adjusted gross income can be used for payments to a private foundation.

18

With respect to the taxation issue, we reach the following findings of fact:

(1) RITA's decision to pay money to DAVID and FOUNDATION was motivated by a desire to resolve the litigation filed against her and was not an act of "disinterested generosity."

(2) KATZ's analysis of the payments from RITA to DAVID and FOUNDATION was more comprehensive, better researched and more credible than the informal opinion rendered by SEIBERT to PARKER.

(3) Whether RITA should or will be required to pay additional taxes based upon PARKER's characterization of the settlement payments as a charitable deduction is an issue to be addressed between RITA and the Internal Revenue Service; the fact that RITA attempted to save tax dollars by characterizing her settlement payments as "charitable" does not change the fact that the payments were intended as a quid pro quo to discharge a legal duty and were never motivated by generosity.

## IV. ISSUES PRESENTED

Throughout the past several years, the parties have proffered numerous arguments. However, as we have sifted through the acrimony-fueled attacks hurled by the parties, we have come to identify four key issues:

(1) Was the time-extension agreement between PARKER and DOWLING binding upon the parties?

19

(2) What is the impact of the fact that RITA declared settlement payments to be charitable contributions?

(3) Is RITA entitled to the return of her $35,254.00 overpayment?

(4) Is DAVID entitled to interest on delayed payment of funds?

## V.    DISCUSSION

### A.    Is The Time Extension Agreement Binding?

Citing case law that prohibits an attorney from settling a client's case without actual authority, DAVID argues that he should not be bound by the time extension agreement between PARKER and DOWLING. DAVID suggests that any modification of a settlement agreement is subject to the same rule. Predictably, RITA disagrees. RITA argues that DOWLING possessed authority under Pennsylvania law to enter into the time extension agreement. In addition, RITA also points out that she was prevented from even addressing the issue of express authority by virtue of DAVID's decision to invoke the attorney-client privilege. For multiple reasons, we agree with RITA that the time-extension agreement is binding.

### (1)    DOWLING's Authority To Enter Into the Agreement

By Definition, an attorney is an agent of a client. See 7 C.J.S. Attorney and Client Section 1. In fact the powers of an attorney are broader than that of an agent. *Cidek v. Forbes National Bank*, 48 A.2d 103, 105 (Pa.Super. 1946). There has long been a presumption in Pennsylvania law that acts undertaken by a lawyer for a client are in fact authorized by the

20

client. See, e.g. *Board of Supervisors of Bensalem Township v. DiEgidio*, 396 A.2d 920, 922 (Pa.Cmwlth. 1979). Though an attorney cannot do an act that is specifically prohibited by the client, attorneys do have the apparent authority to bind clients during management of litigation. See *Cidek*, *supra* at 105; *Pennsylvania R. R. Co. v. City of Pittsburgh*, 6 A.2d 907, 912 (Pa. 1939).

With the above being said, DAVID is correct that attorneys are required to possess express authority in order to settle pending litigation. See *Starling v. West Erie Avenue Building and Loan Association*, 3 A.2d 387 (Pa. 1939); *Reutzel v. Douglas*, 870 A.2d 787 (Pa. 2005). However, it is well within an attorney's apparent authority to enter into agreements that are necessary to facilitate consummation of a settlement agreement that was previously authorized by the client. See *Condemnation of Land v. Big Spring School District*, 699 A.2d 1331, 1334 (Pa.Cmwlth. 1997).

Within the context of this case, we view the agreement between PARKER and DOWLING as one incidental to the settlement agreement and not a part of it. In other words, we view the time-extension agreement between DOWLING and PARKER as one that was designed to facilitate settlement rather than alter it.

Both sides benefited from the time-extension agreement. RITA needed time to gather her assets and investigate the income tax implications of her payments to DAVID. DAVID needed time to create FOUNDATION, negotiate with the Pennsylvania Department of Revenue

regarding tax issues and develop a plan to accept in-kind transfers from RITA. It is obvious to this Court that when the settlement agreement was entered on September 13, 2011, neither of the parties anticipated how difficult the settlement logistics would become. Once both parties realized how much work would actually have to be accomplished to effectuate the settlement, the lawyers simply did what was reasonable – agree to extend the time deadline set forth in the settlement agreement.

DAVID suggests that the time-extension agreement materially altered the rights and obligations of both parties. *Au contraire.* We view the time-extension agreement as being the only viable option available to both parties in order to *effectuate* the terms of the settlement agreement.

Given the facts of this case, the time-extension agreement was necessary to accomplish the settlement that was agreed upon by both DAVID and RITA. As such, the time-extension agreement was not required to be supported by express authority. Even in absence of anything else, we hold as a matter of law that DOWLING had the apparent authority necessary to bind DAVID to the time extension agreement that DOWLING reached with PARKER. This is one reason why we will recognize the time extension agreement as legally enforceable.

## (2) DAVID Cannot Rebut DOWLING's Presumption of Authority

As noted above, the presumption that an attorney acts with authority on behalf of a client is rebuttable. If a client comes forward to challenge the authority of the attorney to perform an act <u>and</u> if he presents factual evidence that he objected or would have objected to the attorney's conduct, a court may examine the question of whether the attorney's actions were taken without express authority. See, e.g. *Condemnation of Lands*, *supra* at 1334. Even when a client does affirmatively refute authorization, the binding effect of the lawyer's acts may nevertheless be recognized when an opposing party justifiably relies upon the attorney's apparent authority. See 7A. C.J.S. Attorney and Client, Section 272.[5]

Notwithstanding the strident arguments proffered by DAVID's counsel, the factual record in this case is barren of anything that would enable us to conclude that DOWLING lacked actual authority to enter into the time extension agreement. In fact, inferences that can be gleaned from the record suggest that the opposite is in fact true.

When the issue of DOWLING's communications with his client arose, DOWLING raised a concern about his ethical obligations under the attorney-client privilege. (See 9/4/14 N.T. 126-129). In response, DAVID's attorney emphasized that his client was "not waiving any attorney-client

---

[5] The legal principle from C.J.S. is predicated upon decisional precedent from states other than Pennsylvania. Nevertheless, we recite this principle because nothing in Pennsylvania law refutes it and because we believe it is consistent with the Pennsylvania principles firmly established by Pennsylvania common law.

communications." (N.T. 127). As a result, an exchange occurred between counsel and the Court. In pertinent part, the following occurred:

The Court: I've heard evidence that there was an agreement reached that there was going to be a delay in the forwarding of the in-kind settlement. That I have heard evidence about. I have not heard Mr. Sawyer state under oath "I never gave Attorney Dowling my authority to delay the transfer of settlement proceeds" or maybe even worse, "I specifically told Mr. Dowling that he was not to delay the transfer of the settlement proceeds." That has not been said by any witness . . .

Mr. Kane: Your Honor, I think that if there's any communication between my client and Mr. Dowling, it would be privileged. I think you would have recognized that. I think if there's testimony by my client about lack of communication that does not go to a communication that I would not waive the attorney/client privilege.

The Court: It may or may not. I don't know what your client is going to say. I don't know what door he's going to open or not open. That's basically the essence of my ruling. At this point, I am going to permit Mr. Weber to ask some questions about what Mr. Dowling did vis-à-vis other parties and other representatives of parties in this litigation. At this point, I am not going to permit you to get into what Mr. Dowling specifically discussed with Mr. Sawyer.

Mr. Weber: Understood.

(N.T. 129-130).

When DAVID testified, both he and his current lawyer carefully avoided the question of DOWLING's authority. In fact, DAVID testified that DOWLING served as his lawyer throughout the civil litigation and DAVID further indicated that he "never" terminated DOWLING's representation of him. By scrupulously avoiding any chance of opening the attorney-client

24

privilege door, DAVID signaled to this Court that there may not be a factual support for his lawyer's protestations that the time extension agreement was unauthorized.

At this point, there is absolutely no factual evidence in the record that would justify a conclusion that DOWLING lacked express authority to enter into the time-extension agreement. To the contrary, DAVID's invocation of the attorney-client privilege and his refusal to even present factual testimony that would call DOWLING's authority into question lead this Court to conclude that DAVID's "DOWLING lacked express authority" argument is nothing more than a red herring.

### (3) DAVID Ratified the Time-Extension Agreement by Failing to Repudiate It

The presumption of an attorney's apparent authority has been described as "very broad." See *Huntzinger v. Devlin*, 80 Pa.Super. 187, 188 (1922). Consistent with this general principle, clients who seek to disavow allegedly unauthorized acts of counsel must act promptly. In *Yarnall v. Workshire Worsted Mills*, 87 A.2d 192, 193 (Pa. 1952), the Court stated: "A client makes his attorney's act his own if he does not disavow it the first moment he receives knowledge that his attorney has transcended his authority." This requirement of prompt repudiation even applies when a lawyer settles a case without express authority; to disavow the settlement, the client must immediately seek to repudiate it. *Piluso v. Cohen*, 764 A.2d 549 (Pa.Super. 2000). As recognized in *Yarnall*, "It is

25

repugnant to every sense of justice and fair dealing that a principal shall available himself of the benefits of an agent's act and at the same time repudiate his authority." *Id.* at 193.

In this case, the time extension agreement was entered into between PARKER and DOWLING during the fall of 2011. DAVID never attempted to repudiate the agreement until 2014. DAVID obviously knew when settlement funds and in-kind transfers were made. He could have filed a motion with the Court seeking to enforce the terms of the settlement agreement. He did not. He could have insisted that DOWLING write a letter demanding immediate transfer of assets. He did not. He could have insisted that DOWLING rescind the time extension agreement. He did not. By failing to promptly repudiate the time extension agreement between DOWLING and PARKER, DAVID effectively ratified that agreement.

### (4)    Conclusion as to Time Extension Agreement

Any of the reasons outlined above would require us to affirm the validity of the time extension agreement by PARKER and DOWLING. The existence of all three grounds renders our decision nearly self-evident. We therefore recognize as binding the time extension agreement reached by PARKER and DOWLING. We will not declare the timing of RITA's payments to be a breach of the parties' settlement.

## B. Characterization of Settlement as a Charitable Contribution

Candidly, we found the parties' arguments regarding the charitable contribution issue to be curious and even somewhat counterintuitive. For example, DAVID argues that any effort to characterize RITA's payments as "voluntary" would be "utterly ridiculous." (See DAVID's Brief at pg. 4). Our visceral reaction is that this argument is self-defeating. If in fact the payments made by RITA were "involuntary" payments in satisfaction of a settlement, then amounts paid in excess of the agreed-upon settlement amount could be declared to be a mistake. This would obviously support RITA's arguments. On the other hand, RITA in her testimony sought to characterize the settlement payment as a voluntary charitable contribution for which she could claim a tax deduction. If in fact the entire amount paid by RITA to DAVID was a voluntary charitable contribution, then RITA would have no basis to request the return of a portion of it. Thus, our visceral reaction to RITA's argument was that it supported DAVID's position.

Notwithstanding our confusion generated by the parties' counterintuitive arguments, our belief is that the issue of whether RITA is entitled to deduct her settlement payments as charitable contributions is one for the IRS to decide. Based upon the totality of evidence presented, it is clear that RITA agreed to pay a monetary settlement amount to DAVID and FOUNDATION in order to resolve contested litigation. As RITA herself stated in her deposition: "My intent was to the letter of the settlement that we established back in 2011 . . . My intent was to pay the foundation what

I agreed to pay." (Sawyer N.T. 42, 48). Any effort to interpret the record as a desire by RITA to voluntarily contribute money to DAVID or the foundation he created is, to use KANE's words, "utterly ridiculous." The amounts paid by RITA were not "disinterested benevolence." Without DAVID's litigation staring her in the face, there is no way that RITA would have agreed to contribute any money to fund a foundation controlled by a man she despises. To this Court, it is patently obvious that the money paid by RITA was to satisfy a legal duty that was created via the above-referenced litigation.

From the beginning of Pennsylvania jurisprudence, a gift has been characterized as "a gratuity and not a transfer for full consideration." *Riddle v. Stewart*, 4 Pa. 113, 1884 WL13289 (Pa.1884). To be deemed a gift, Pennsylvania law requires "donative intent." *In re: Estate of Moskowitz*, 115 A.3d 372 (Pa.Super. 2015). Such intent can be established by both acts or declarations. *Widener University, Inc. v. Estate of Boettner*, 726 A.2d 1059, 1062 (Pa.Super. 1999). The entirety of the record must be considered when determining whether a transfer was in fact a gift. *Moskowitz, supra.*

Based upon the law as outlined above, a settlement payment to resolve contested litigation would not generally be considered a "gift." Settlements are generally motivated by a desire to avoid the risk of losing a law suit. There is generally a quid pro quo that accompanies a settlement payment; the opposing party gives up the right to present his/her case to a

28

jury. In most cases, "donative intent" simply does not motivate settlement of contested litigation.

With the above being said, we still must address DAVID's argument that RITA's treatment of $35,254 as a charitable contribution on her tax return somehow *requires* that we classify said amount as gratuitous gift. While we tend to agree with DAVID that KATZ is correct in his assessment that the amounts paid by RITA to DAVID and FOUNDATION were not "disinterested generosity" and therefore not legitimate charitable deductions, we cannot declare RITA's probably mistaken characterization of the settlement payments as charitable to be anything other than an effort to avoid taxation.[6]

Pennsylvania's appellate courts have recognized that characterization of an amount paid as charitable on tax returns is *evidence* but not *conclusive proof* of donative intent. In **Brown v. Brown**, 479 A.2d 573, 578 at note 2 (Pa.Super. 1984)[7], the Court stated:

> Although a tax avoidance motivation may suggest a donative intent, **Clay v. Keiser**, 460 Pa. 620, 626-27, note 3, 334 A.2d 263, 266, note 3 (Pa. 1975), it is ultimately immaterial to the court's determination that a gift was or was not effected. **Cohen v. Tonkin**, 358 Pa. 422, 425, 57 A.2d 840, 842 (Pa. 1948).

---

[6] Although DAVID cites numerous taxation cases in support of his challenge to RITA's characterization of the $35,254 payment, none of the cases cited by DAVID stand for the proposition that a taxpayer is estopped by virtue of his/her tax return from declaring that the amount deducted represented satisfaction of a debt and not "disinterested generosity." Moreover, we cannot ignore the fact that PARKER did later amend the tax returns to remove $35,254 from RITA's charitable deductions. Even KATZ acknowledged in his testimony that he "had no idea" what the amended return "did or did not do" from a legal standpoint as it relates to the amount of the overpayment.

[7] **Brown** was overruled on other grounds as recognized in **Macklica v. Macklica**, 716 A.2d 653 (Pa.Super. 1998).

29

Based upon this law, we reject DAVID's argument that RITA's attempt to claim her settlement payment as a charitable deduction precludes us from determining that $35,254 was a mistaken overpayment.

The explanation proffered by PARKER and RITA for the $35,254 overpayment was credible. PARKER candidly and credibly admitted that he made a mistake when calculating amounts transferred. In a letter written in 2013, in sworn deposition testimony, and under oath at the time of trial, PARKER acknowledged that he made a mistake when he overfunded the settlement amount by $35,254. Such testimony was against his own interests.[8] As he testified, we saw the pain in PARKER's face when he acknowledged his error. Stated simply, we believe that PARKER was honest and accurate when he testified that the $35,254 amount in controversy was a mistaken overpayment.

Based upon the totality of the voluminous evidence presented in this case, we are convinced beyond any doubt that RITA mistakenly overfunded an agreed-upon settlement amount by $35,254. We are likewise convinced that RITA had no donative intent to contribute $35,254 to FOUNDATION. Notwithstanding RITA's initial effort to save tax money by characterizing the overpayment as a charitable deduction, we remain convinced that the $35,254 represents nothing more than a mistaken settlement overpayment.

---

[8] By admitting his mistake, PARKER potentially opened himself up to be a defendant in civil litigation.

## C.    Is RITA Entitled to Reimbursement for her Overpayment?

"When one makes a payment under a mistake of fact, he may recover back the amount of such payment." **Gilberton Fuels v. Philadelphia and Reading Coal and Iron Co.**, 20 A.2d 217, 219 (Pa. 1941).    Under the doctrine of equitable restitution, a party who erroneously transfers money to another is entitled to reimbursement when two elements are found to exist:

(1)    Mistake of fact; and

(2)    Consequential unjust enrichment.

See **Gilberton**, supra; **National Maritime Union of America v. Taystee Barbecue Corp.**, 161 A.2d 646 (Pa.Super. 1960). The doctrine of equitable restitution is predicated upon the precept that "a person who has been unjustly enriched at the expense of another is required to make restitution to the other." See RESTATEMENT OF RESTITUTION Section 1.

Mistaken overpayment of benefits is an issue that arises relatively frequently within the workers compensation arena. A body of case law has developed to address mistaken overpayments of compensation benefits. As a general proposition, "recoupment is permitted if the overpayment resulted from a mathematical miscalculation . . . or the employer's mistaken belief that the payment was necessary to discharge its duty under the Act." **Devlin Electric, Inc. v. W.C.A.B.**, 2014 WL4749632 (Pa.Cmwlth. 2014); **Commonwealth of Pennsylvania v. W.C.A.B.**, 80 A.3d 525, 531-32 (Pa.Cmwlth. 2013).    Courts have reasoned that recoupment of such

overpayments is necessary "to prevent unjust enrichment or a double recovery." *Commonwealth v. W.C.A.B. (Noll),* 80 A.3d 525, 529 (Pa.Cmwlth. 2013).

The case of *Lucey v. W.C.A.B.,* 732 A.2d 1201 (Pa. 1999) is pertinent. In *Lucey,* an employer paid $140,000 to compensate a claimant for his medical expenses. Claimant's counsel then withheld payment from the hospital until it agreed to accept $110,000 as satisfaction in full of the outstanding medical bill. The remaining $30,000 was then paid to the claimant. When the employer learned of the claimant's agreement with the hospital, it sought to have the $30,000 difference remitted. Looking to the Restatement of Restitution, Pennsylvania's highest Court agreed with the employer. The Court stated:

> This Court has previously looked to the Restatement of Restitution as a source of authority in determining whether the retention of a particular benefit would be unjust. Section 20 of the Restatement provides us as follows:
>
> > Section 20. Mistake as to extent of duty or amount paid in discharge thereof:
> >
> > A person who has paid another an excessive amount of money because of an erroneous belief induced by a mistake of fact that the sum paid was necessary for the discharge of a duty, for the performance of a condition, or for the acceptance of the offer, is entitled to restitution of the excess.
>
> The foregoing provision of the Restatement is applicable to the matter sub judice, and the provision mandates a subrogation credit in favor of employer. Here, the employer believed that the full $140,000 which was tendered to claimant was necessary in order to pay claimant's medical bills and thereby discharge employer's duty under the workers compensation statute. However, in order to discharge an employer's duty under the

32

statute with regard to medical expenses, an employer need only pay an employee's actual medical expenses. Here, employer tendered an amount which ultimately proved to exceed claimant's actual medical expenses by $30,000, based upon employer's mistaken factual belief that the full sum proffered would prove to be the sum necessary for discharge of employer's duty. Consequently, under Section 20 of the Restatement, employer is entitled to restitution of the $30,000 excess.

*Id.* at 1204.

In this case, the record clearly supports the proposition that PARKER overpaid DAVID by $35,254 due to a simple mathematical miscalculation. To permit DAVID to take advantage of this mathematical miscalculation would be unjust. In our opinion, the principles of the Restatement of Restitution articulated in *Lucey* above apply with equal force to the situation before us today. Based upon the evidence presented, RITA has established both a mistake of fact and consequential unjust enrichment. Accordingly, RITA is entitled to return of the $35,254 overpayment amount.

## D.    Is DAVID Entitled to Interest on the Delayed Payments?

The issue of whether DAVID is entitled to some interest is an interesting one. At least to some degree, we sympathize with the arguments proffered by both parties regarding the issue.

DAVID emphasizes that he was entitled to receive the settlement proceeds by December of 2011 and he did not. DAVID appropriately points out that there is a time value to money and that RITA benefited by earning dividends and interest on her money while he and FOUNDATION were waiting for the settlement proceeds to be forwarded. In response, RITA

33

points out that an agreement had been reached to delay payment and the agreement did not call for the payment of interest. In addition, RITA also argues that a significant percentage of the delay in payment was caused by DAVID himself. Under such circumstances, RITA argues that it would not be equitable to require that she pay interest.

Initially, we must remember that a binding time-extension agreement was reached between PARKER and DOWLING. Given the time extension agreement, the delay in forwarding settlement funds could not be characterized as a "breach of contract." Moreover, we must also recognize that the time extension agreement was silent as to interest. By virtue of the above, the question we must answer becomes: In the absence of a breach of contract, what common law duty exists that would require a debtor to pay interest during delay in satisfaction of the debt?

Generally, an award of pre-judgment interest is predicated upon concepts of equity. *Gurenilin v. Gurenilin*, 595 A.2d 145 (Pa.Super. 1991). "The fairest way for a court is to decide questions pertaining to interest according to a plain and simple consideration of justice and fair dealing." *Murray Hill Estates, Inc. v. Bastin*, 276 A.2d 542, 545 (Pa. 1971), quoting *McDermott v. McDermott*, 196 A. 889 (Pa.Super. 1938). In a case where a defendant fraudulently withholds funds to which another is entitled, it is an abuse of discretion for a Court to deny prejudgment interest. *Sack v. Feinman*, 432 A.2d 971 (Pa. 1981). However, when a defendant "did not fraudulently, intentionally and wrongfully procure or withhold appellant's

34

money," it is within the discretion of a Trial Court to deny an award of interest. *Gurenilin*, *supra*.

In examining the question of whether DAVID should be entitled to interest during the delay in payment, we will divide the pertinent periods of delayed payment into several segments. The first will encompass the time frame between the date of settlement and July of 2012. The second will address periods of time subsequent to July of 2012.

## (1)   Time period Prior to June of 2012

As noted in the beginning sections of this Opinion, the parties' settlement was reached in September of 2011. Thereafter, DOWLING and PARKER agreed to extend the time for payment. This agreement was reached for reasons that benefited both parties. However, two reasons for the delay are of particular concern to this Court.

The first involves establishment of FOUNDATION. Following the parties' settlement, PARKER requested information regarding FOUNDATION. It was not until December 2, 2011 that this information was communicated. Until information regarding FOUNDATION was communicated to PARKER, it was not even *possible* for PARKER to comply with the settlement agreement. The second issue of concern regarding delay preceding June of 2012 was DAVID's need to que up the tax ramifications of the settlement with the Pennsylvania Department of Revenue. Time and again, DOWLING advised PARKER that the settlement could not be consummated because the PA Department of Revenue had not

35

yet approved the proposed split of distribution between DAVID's wrongful death and survival claims. In fact, DOWLING testified that at one point, the Department of Revenue lost documents and they had to be re-sent. It was not until May 7, 2012 that the Pennsylvania Department of Revenue provided approval that DAVID had requested. Until this time, it would not have been in DAVID's interest to accept in-kind transfer of funds.

Once the Department of Revenue approved DOWLING's proposed allocation of funds, PARKER acted swiftly to transfer assets to FOUNDATION. Between June 7, 2012 and July 9, 2012, $985,666.07 in assets were forwarded in compliance with the settlement agreement. As of July 9, 2012, $1,679,127.48 in cash and in-kind assets had been transferred to DAVID and FOUNDATION.

As we consider the existence of a time extension agreement between PARKER and DOWLING, the reasons behind that time extension agreement and PARKER's consistent willingness between October of 2011 and June of 2012 to comply with the settlement agreement, we conclude that it would be unfair to award DAVID prejudgment interest for the time period prior to July 9, 2012. As simply as we can put it, equity would not support the award of prejudgment interest during the period of time when delay in payment was caused in large part by circumstances that were completely outside RITA's control.

## (2)  Delay Following July of 2012

As of July 9, 2012, $320,872.52 remained to be paid from RITA to FOUNDATION.  As best as we can glean from the record, the primary reason why this amount remained unpaid as of July 9, 2012 was that certain asset management funds would not transfer monies based solely upon PARKER's signature.  PARKER wrote numerous emails and letters to MAIORIELLO indicating that he could not transfer funds without a "signature guaranty" from RITA and that such a guaranty could not be obtained while RITA was in prison.

Eventually, PARKER was able to pay an additional $140,000 on September 4, 2012 and another $48,111.11 on September 7, 2012.  Thereafter, PARKER was not able to provide a final payment until February 23, 2013.  No adequate explanation was provided for the delay between September 6, 2012 and February 23, 2013.

We have discerned nothing in the record that would lead us to conclude that DAVID was directly or indirectly responsible for delays in payment that occurred between July 9, 2012 and February 23, 2013.  To the extent that PARKER had difficulty obtaining signatures given RITA's incarcerated status, such difficulty was not attributable to DAVID.  DAVID did not cause RITA's incarcerated status, nor did he control the funds for which signatures were needed.  Similarly, no adequate explanation was provided by PARKER or anyone else for the five month delay in the final payment that occurred between September 7, 2012 and February 23, 2013.

37

Accordingly, we attribute delays in payment between July 9, 2012 and February 23, 2013 to RITA and not DAVID. During this time equity favors an award of interest.

RITA argues that the time extension agreement between PARKER and DOWLING precludes any award of interest. At least for the time period after July 9, 2012, we disagree. Under Pennsylvania common law, interest begins to accrue on the date a debt is due. *Dox Planks of Northeast Pennsylvania v. Ohio Farmers Ins. Co.*, 621 A.2d 132 (Pa. Super. 1993). Thereafter, prejudgment interest can be awarded when it is necessary "to avoid injustice." *In re: Estate of Alexander*, 758 A.2d 182 (Pa.Super. 2000). Moreover, an award of prejudgment interest does not require malicious intent; requiring payment of interest is simply intended to make the obligee whole, and punitive considerations are not a part of the analysis. *Centennial School District v. Karins*, 840 A.2d 377, 383 (Pa.Cmwlth. 2003). In this case, the time extension agreement was silent as to interest. In absence of language dealing with interest, the general common law principles focusing on equity and justice must be applied. Those general principles, in our opinion, require an award of interest for the time period following July 9, 2012.

With respect to the amount of interest, courts are not bound by a statutorily determined amount. In *Gurenilin, supra*, the Court stated: "The determination of whether to award prejudgment interest *and the rate of such interest* is left to the sound discretion of the trial court in equity." *Id.* at 147

38

(emphasis added).   In a recent Opinion authored by this Court in *City of Lebanon v. Cornwall Borough*, No. 2012-01222 (Charles, J., July 15, 2015), we discussed the rate of pretrial interest in a case involving millions of dollars.  We stated:

> There are several ways to calculate time value of money. Historically, the legal interest rate of 6% has been employed as a means to compensate a plaintiff who was deprived of the use of money to which the plaintiff was entitled.   However, in some economic climates, fixed interest of 6% may not be fair.   For example, during the great recession years of 2008 through 2010, no investment in America would have generated a return of 6%.   In contrast, most investors would have fired an investment broker who earned them only a 6% return between 2012 and 2014.

In *City of Lebanon*, we analyzed average investment returns generated from statistical data maintained by Forbes Magazine and the standard in Poor's Fortune 500 Index.  We noted a wide disparity in figures.  We stated:

> If we were to select some sort of investment-driven measure of interest, powerful arguments would be available to contravene our selected measure.   In our research to identify ten year investment averages, we identified numerous options . . . Some were no doubt driven by "puffing" designed to motivate sales and were as high as 25%.  Others, like the Forbes Magazine estimate, were much lower. A few closely approximated the 6% legal rate . . .

Eventually, we selected 6% per annum as the appropriate measure of prejudgment interest.   We concluded:   "Our desire is not to punish the DEFENDANTS or afford PLAINTIFFS with a windfall that would overcompensate them for the time value of money they lost.  We believe that our choice to select 6% per annum as an appropriate measure of interest achieves equity."

We will follow the decision we rendered in *City of Lebanon*.  Rather than selecting an arbitrary investment-driven measure of interest that may or may not comport to the reality of what would have been earned by DAVID had he enjoyed

39

possession of the funds, we will simply select 6% as the measure of interest to be awarded.

Based upon the above, we will order interest in accordance with the following chart:

| Balance Remaining To Be Paid | Interest Rate | Dates | Amount of Interest |
|---|---|---|---|
| $320,872.00 | 6% | 7/9/12 to 9/7/12 | $3,164.76 |
| $132,761.00 | 6% | 9/8/12 to 2/23/13 | $3,666.39 |
| TOTAL: | | | $6,831.15 |

It is the above amount that we will award to DAVID in interest.

## VI.   RECAPITULATION

Based upon the analysis outlined above, we have determined that RITA is entitled to be reimbursed for the mistaken overpayment she made of $35,254. We have also determined that DAVID is entitled to interest on the unpaid balance owed to him of $6,831.15. Deducting DAVID's interest entitlement from RITA's overpayment results in a net amount due to RITA of $28,422.85. Our decision today will require DAVID and/or FOUNDATION to repay this amount to RITA within 60 days.

It is our hope that the decision we have rendered today will end the acrimonious litigation filed in the above-referenced case. We remind both DAVID and RITA that a settlement was reached in September of 2011; no one disputes the existence of the settlement or its terms. We also remind RITA and DAVID that large amounts of money have been transferred from

40

RITA to DAVID and FOUNDATION pursuant to the settlement. Finally, we remind DAVID and RITA that the amounts that have been fought over during the past two years represent only a relatively small percentage of the amounts in controversy within the above-referenced litigation. While the legal issues proffered by the parties are indeed interesting and even somewhat esoteric, the amounts involved simply do not justify further bickering.

We are well aware that there is no love lost between DAVID and RITA, and that the reasons behind their sibling animus are legitimate and palpable. Nevertheless, both RITA and DAVID must remember that each found a way to amicably resolve the underlying litigation in a way that honored the memory of their parents. We hope that with the decision that we have rendered today, both parties will move forward as best as they can with their respective lives. We are confident that is what the parties' parents would have wanted.